# SHEPHERD v. UNITED STATES.
## No. 49167.

United States Court of Claims.
July 13, 1953.

Francis M. Shea, Washington, D. C., for plaintiff. Warner W. Gardner, Lawrence J. Latto, Washington, D. C., Murphey Candler, Jr., and Searcy L. Johnson, Dallas, Tex., were on the briefs.

Mary K. Fagan, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

Plaintiff, W. C. Shepherd, entered into a contract with the defendant to construct the Cumberland Oil Field protective levees, which was a part of the Denison Dam and Reservoir Project on the Red River between Oklahoma and Texas. The Denison Dam is about ten miles below the confluence of the Washita and Red Rivers. After it should have been completed it was expected that the wtaer in the Washita River would be backed up for about forty miles. The Cumberland Oil Field lies adjacent to the Washita River at a point about thirty miles above the Denison Dam, and the backwater would have flooded it. At the time this field had seventy-five producing oil wells and it was expected that an additional seventy-five wells would be drilled in the near future. The construction of the levees was to protect this oil field.

A part of the work consisted in the diversion of the Washita River at the upper part of the work. A channel about 3,300 feet long and 600 feet wide and around forty feet in depth was to be constructed, through which the river was to be diverted. This was known as Channel No. 1. On leaving this channel the water was designed to flow down a natural declivity, and then into another channel, known as Channel No. 2, which was to be about 7,000 feet long and 350 feet wide, involving cuts up to as much as 80 feet in depth.

The protective levees were to be constructed for the most part from the material excavated from the two channels. The levees were to have a total length of 23,480 feet, and an average height of about 50 feet.

Plaintiff claims that in the excavation of Channel No. 2 he encountered wet materials, which differed materially from the character of materials shown on the drawings or indicated in the specifications, and that he is, therefore, entitled to a modification of the contract to provide for the increase in cost in the handling of this wet material over what it would have cost to handle the material plaintiff says he had a right to expect. He also says that in the excavation of Channel No. 1 he encountered and had to handle much more pervious material than he had reason to expect.

His third claim is that the contracting officer required excessive wetting of the levees and unnecessary compaction of the materials placed therein. He claims damages for the increased cost of doing this work in the manner required.

The case was heretofore argued before the court on the sole question of whether the plaintiff had complied with the requirements of the contract relative to notice, protest, and appeal. On October 2, 1951, we rendered an opinion holding that the plaintiff had complied with these requirements. The case was then remanded to the Commissioner for the purpose of taking proof on the question of plaintiff's right to recover on the three items asserted in his petition, assuming compliance with the requirements relative to notice, protest, and appeal. These items were (1) excess costs by reason of encountering conditions differing from the plans and specifications or of an unusual nature not ordinarily encountered in work of this character; (2) excess costs incurred by reason of a change in design of the work; and (3) extra work demanded in the compaction of the fills.

Notwithstanding the fact that, prior to the taking of any testimony in the case, the defendant had moved for an order limiting the issues to be tried by the Commissioner to the question of whether or not the plaintiff was "precluded from recovery by virtue of the contract provisions relating to protests and appeals," and the allowance of this motion, a great deal of testimony was

introduced by both parties on the whole question of liability, and we made findings based upon the testimony introduced. However, on remand to the Commissioner, further and more complete evidence was introduced, which now makes it necessary for us to amend and enlarge our former findings. For this reason our former special findings of fact are withdrawn and the findings set out hereinafter are substituted in lieu thereof.

Defendant again raises the question of plaintiff's compliance with the requirements of the contract relative to notice and appeal. It does so because of the Supreme Court's opinion in United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113. It says the Board of Contract Appeals of the War Department had held that plaintiff had not complied with these requirements and that this finding is conclusive on us under the decision in that case.

In its exceptions to the Commissioner's findings defendant sets out what it regards as the pertinent parts of the findings of the contracting officer and of the Board of Contract Appeals. According to these excerpts the contracting officer held that plaintiff was not entitled to maintain his claim because it had not been filed until after all the work had been completed. His finding that the claim was not filed until after all the work had been completed, unreversed on appeal, is binding on us, but his conclusion that for this reason plaintiff is not entitled to recover is not binding.

Also, the finding of the Board that plaintiff did not tell the Chief of Operations and the resident engineer that he intended to make a claim for extra compensation under article 4 is binding on us;[1] but its conclusion that for that reason plaintiff cannot recover is not binding, since this conclusion calls for a construction of the contract.

In our former opinion we said that the only obligation on the contractor in the first instance was to give notice to the contracting officer of the conditions differing from those the contractor had a right to expect, and that when he had done this, he had no further duty to perform until after the contracting officer had investigated the conditions and had made a ruling on whether or not they were different to such an extent as to require an equitable adjustment. The Board of Contract Appeals does not find that such a notice was not given.

The Board refused to consider the claim because plaintiff did not notify the contracting officer that he meant to make a claim for extra compensation under article 4. We do not think it was necessary for plaintiff to have done this at the time he called the conditions to the attention of the contracting officer. When he told the contracting officer that he had encountered a condition that was in fact different from what he had a right to expect, he had done all the contract required of him at the time.

The giving of the notice required an investigation by the contracting officer and a ruling. The investigation was made in this case by the contracting officer's authorized representative, but his only ruling was that the material encountered was suitable to be used in the fill to be constructed. He did not rule on whether or not the conditions so materially differed as to entitle plaintiff to an equitable adjustment.

Until this ruling was made, plaintiff was not required by the contract to go further. Plaintiff, however, did go further. He himself made several trips to see the contracting officer in an effort to secure relief from him. The contracting officer himself intended to make an investigation of the conditions and to make a ruling on whether plaintiff was entitled to an adjustment, and left plaintiff under the impression that the

1. In our former opinion we said plaintiff asked the resident engineer if he should shut down the job and present his claim then, but that he was told he would not be permitted to shut down the job and that he could make his claim at the conclusion of all the work. This statement was based on the plaintiff's evidence alone. For some unexplained reason the

defendant did not introduce the resident engineer as a witness. He did appear as a witness before the Board of Contract Appeals.

In fairness to present Government counsel, it should be said that she did not represent the Government in the hearings in this case prior to our former opinion.

matter would receive further consideration, but, due to his sudden transfer to another assignment, he never did so.

Plaintiff never received a ruling by the contracting officer on whether the conditions encountered were sufficiently different from those he had a right to expect as to entitle him to an equitable adjustment.

He did get a ruling from the Chief of Operations that the material was suitable to use in the fill, but none on whether he was entitled to an equitable adjustment. Nor was this a final ruling from the office of the contracting officer, because, as stated, the contracting officer himself intended to investigate conditions and make a ruling.

If the character of the notice plaintiff gave defendant was a sufficient compliance with the contract, we think plaintiff's claim is not barred, since he later did make the claim that one of the conditions encountered was unforeseen and entitled him to an equitable adjustment. But was the notice sufficient? In our former opinion we did not rule on the question of whether plaintiff had to notify the contracting officer that he intended to make a claim under article 4. We did not because of plaintiff's supposed conversation with the resident engineer asking him if he should shut down the job and make a claim then. We said that in view of all that had gone before, it was the duty of the resident engineer to communicate this to the contracting officer, and that had he done so, the contracting officer would have had all that could be required in the way of notice.

We are now faced, however, with the implied finding of the Board of Contract Appeals that plaintiff did not have this conversation with the resident engineer. It does not appear from the excerpt from the Board's opinion that it made this express finding, but it is evident that the Board accepted the testimony of the resident engineer that no such conversation took place. Under the Wunderlich decision this finding is binding upon us.

Stripped of this conversation, we have left a complaint by the contractor of the wet material encountered in Channel No. 2 and the statement that it was increasing his costs to put it in the fill, but no claim at the time that it was an unforeseen condition entitling him to an equitable adjustment. What the plaintiff was seeking was permission to waste this material and to get material for the fill from the borrow pits, which would have greatly increased plaintiff's compensation. This was his objective; not an equitable adjustment in the contract price because of an unforeseen condition.

Since plaintiff made no claim of an unforeseen condition, the contracting officer evidently thought that he was not required to make an investigation to determine whether or not the conditions encountered should have been foreseen and, therefore, whether or not plaintiff was entitled to an adjustment in the contract price. He had knowledge of the conditions, but so far as we know he never made any investigation to determine whether or not they should have been foreseen.

 This, however, should not foreclose plaintiff from later making a claim under article 4. He called the contracting officer's attention to the conditions before they were disturbed, and this is all that the contract required of him. Article 4 reads in part, " * * * the attention of the contracting officer shall be called immediately to such conditions before they are disturbed." What is to be done next is the responsibility of the contracting officer.

It is true plaintiff's request was to be allowed to waste the materials, and that he did not claim the conditions differed from those he had a right to expect; but how did this prejudice the defendant? It knew of the conditions and could have determined at any time whether or not they differed from those shown on the plans and specifications. It was not necessary for plaintiff to claim at the time that the conditions differed. The contract imposed the duty on the contracting officer to determine whether the conditions were materially different, even if he himself discovered the conditions; that is, in a case where the plaintiff took no action at all. Article 4 reads in part:

"Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or

latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications * * *."

The duty of determination was cast on the contracting officer when he became aware of the conditions, however his attention was directed to them.

Plaintiff's request to be allowed to waste the materials no doubt induced the contracting officer not to make at that time the determination of whether the conditions so materially differed from those plaintiff had a right to expect as to entitle him to an equitable adjustment; but, when plaintiff at the conclusion of the work filed a claim on the ground that they did differ, the duty was cast upon him at that time, at least, to make the determination. Since the contracting officer had been immediately apprised of the conditions, he at any time could have determined whether they differed from those shown on the plans and specifications, or were of an unusual nature differing materially from those ordinarily encountered. Plaintiff's failure to make this claim at the time the condition was discovered did not impair the ability of the contracting officer to make the determination when the claim was made.

Since neither the contracting officer nor the head of the department made the required determination, plaintiff is not precluded from calling on this court to do so.

What we have said applies to a claim under article 4; it does not apply to a claim under article 3. That article requires a contractor to make his claim for an adjustment in the contract price within ten days from the time the contracting officer makes a change in the drawings or specifications. Article 4 contains no such requirement.

In our former opinion in this case we said:

"What has been said relative to the wet materials encountered in Channel No. 2 is equally applicable to the excess sand encountered in Channel No. 1. We are of opinion that plaintiff's rights under article 4 are not precluded for failure to comply with the contract requirements relative to the excess sand

in Channel No. 1, as well as the wet materials encountered in Channel No. 2."

There is, however, an important difference between the claim relative to the wet materials in Channel No. 2 and the excess sand in Channel 1. That difference is this:

In the detailed claim filed with the contracting officer on May 15, 1944, after the conclusion of the work, plaintiff claimed that the wet materials was an unforeseen condition; but he did not make this claim with respect to the excess sand. His claim relative to it was that the design of fill areas II and III had been changed so as to utilize this excess sand, and that this change in design increased his costs. This is a claim under article 3, and, as we said above, such a claim has to be made within ten days from the time the change is ordered. The contracting officer properly denied the claim when made later.

The first time plaintiff claimed that this was an unforeseen condition, and that he was entitled to an equitable adjustment under article 4, was in his petition in this court. This claim was never presented to the contracting officer. Does this bar plaintiff? We think it does. The contract provided for the settlement of disputes by the contracting officer, with the right of appeal to the head of the department. Article 15 says:

"* * * all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer * * *."

The contracting officer was the agreed "forum." By their agreement the parties did not intend to leave to the courts the determination of disputed facts; they did not intend that the courts should decide what was an equitable adjustment for an unforeseen condition; they intended that the contracting officer should do so. United States v. Callahan-Walker Construction Co., 317 U.S. 56, 63 S.Ct. 113, 87 L.Ed. 49. Therefore, if plaintiff thought that this excess sand was such an unforeseen condition as to entitle him to an equitable adjustment, he was required by the contract to present

this claim to the contracting officer for his decision. This the plaintiff did not do; instead, he presented a claim under article 3, based on a change in design of the fills. With reference to the wet materials in Channel No. 2, he did present his claim under article 4, but not as to the excess sand.

■ Many times we have held that failure to pursue the prescribed administrative remedy bars a plaintiff from prosecuting his claim in the courts.

It follows from this that, while plaintiff is entitled to prosecute in this court his claim relative to the wet materials in Channel No. 2, he is not entitled to prosecute his claim relative to the excess sand.

Plaintiff also contends that defendant breached the contract by requiring excessive wetting and compaction on the fills. It is alleged that the difference between the reasonable cost and the actual cost of the rolled fill work was $568,460.97, of which $301,432.89 was due to the defendant's requirement of excessive wetting and compaction. Included in the $301,432.89 is the sum of $44,256.53 claimed on behalf of the subcontractor.

The facts relating to this claim are set out at length in findings 60–80. In brief, they are that defendant's inspectors required more wetting of the pervious material placed on the fills and more passes of the sheep's-foot roller than was necessary to secure compaction of the fills to the density of at least 90 percent, as required by the contract.

Except for his claim relative to placing the wet materials on the fills, we do not think plaintiff is entitled to recover, because of his failure to protest to the contracting officer against what was being required of him.

The defendant's inspectors thought that the amount of wetting and the number of passes of the sheep's-foot roller which they demanded were necessary in order to secure the required compaction. If the plaintiff did not think so, it was his duty to present the dispute to the contracting officer, who was the arbiter designated by the contract to settle such matters.

Neither the contract nor the specifications specified the amount of the wetting or the number of passes with the sheep's-foot roller that would be necessary; it provided for such amount of wetting and such number of passes as were necessary to secure the required compaction. How much wetting and how many passes were required to do so was a question of fact. Disputes concerning questions of fact were required by the contract to be settled by the contracting officer.

Plaintiff never brought the matter to the attention of the contracting officer nor to his authorized representative and, therefore, these officials had no opportunity to pass on the question. Plaintiff cannot bypass the contracting officer and call on this court to settle a dispute which he should have presented in the first instance to the contracting officer.

■ It is true, as we said in our original opinion in this case, the specifications do not explicitly provide for protest against any requirement for work believed to be in excess of the contract requirements, but the contract does provide for the settlement of disputes by the contracting officer; and, hence, the plaintiff cannot call on this court to settle the dispute as to whether excessive wetting and compaction were being required unless he had first presented it to the contracting officer.

If the resident engineer and the inspectors were deliberately calling upon plaintiff for greater compaction than was called for by the contract, they were calling for an extra, and the plaintiff should have refused to do the extra work demanded until he had secured from the contracting officer an order in writing, with the cost of the extra work stated in the order, as required by article 5 of the contract. Plaintiff did not demand such an order and no such order was given. It was not given both because it was not asked for, and also because the resident engineer did not think that more work was being required than was necessary in order to comply with the contract.

■ In any event, we do not think that plaintiff has established the cost of what-

ever work was required of him over and above that necessary to meet the contract requirements. Plaintiff's excess costs in connection with the compaction of the rolled fills were due to several causes, to wit: the extra cost incident to the use of the wet material from Channel No. 2, the extra cost incident to the use of the excess pervious material from Channel No. 1, extra costs attributable to defective watering equipment and inadequate rolling equipment and other causes. It is impossible to tell from plaintiff's proof how much of his excess costs was caused by one thing or another. We cannot tell how much of them was due to unnecessary wetting or excessive passes of the sheep's-foot roller. Plaintiff is therefore not entitled to recover. Addison-Miller, Inc. v. United States, 70 F.Supp. 893, 108 Ct.Cl. 513; certiorari denied 332 U.S. 836, 68 S.Ct. 217, 92 L.Ed. 408; Eastern Contracting Co. v. United States, 97 Ct.Cl. 341.

As to plaintiff's contention that the wet material[2] encountered by him and his subcontractor in the excavation of Channel No. 2 constituted an unforeseen condition within the meaning of article 4 of the contract, as a result of which the costs of excavating, hauling, and placing the wet material on the fill were greatly increased, defendant concedes, as indeed it must, that wet material was encountered in Channel No. 2, but it denies that this constituted a changed condition.

Defendant has taken sharp issue with the findings of the Commissioner of the court in regard to the wet materials claim. After carefully considering the numerous exceptions to the Commissioner's findings, we are of the opinion that his report fairly and accurately states the facts established by the record, and we have adopted them as the court's findings, with minor exceptions.

We do not think there can be any question but that the wet material was unforeseen by both plaintiff and defendant. It was an unknown, subsurface condition differing materially from that shown by the drawings, specifications and borings, and

one which could not have reasonably been anticipated from a study of the drawings, borings and samples, or by an examination of the site. (Finding 32.) Plaintiff is therefore entitled under article 4 of the contract to recover the full excess costs of excavating, hauling, and placing the wet material on the fill, unless limited in his recovery by a matter hereinafter discussed. Great Lakes Dredge & Dock Co., v. United States, 90 F.Supp. 963, 116 Ct.Cl. 679; certiorari denied 342 U.S. 953, 72 S.Ct. 624, 96 L.Ed. 708; Loftis v. United States, 76 F.Supp. 816, 110 Ct.Cl. 551.

The presence of this wet material was due to the existence of two large depressions in the shale and one smaller one. Approximately 150,000 cubic yards of the material excavated from Channel No. 2 were in a semi-liquid or soupy state, and there was about the same amount of wet material lying above the saturated material. It was first encountered by the subcontractor in June of 1943. Defendant's inspector permitted the wasting of 150 cubic yards of it, but shortly thereafter the resident engineer directed that the material be placed in the fill. This decision was later approved by the chief of operations on the project, and also by the contracting officer, Colonel Wanamaker.

The wet material greatly increased the cost of excavation and hauling in Channel No. 2. It was necessary for plaintiff to excavate with a dragline rather than a shovel, as had been planned. The soupy material drained from the bucket, greatly reducing the loading efficiency of the equipment. The hauling equipment could be filled only to the water line with the semi-liquid material, and it drained or sloshed out of the equipment on the upgrades. Movement of machinery through the wet material both in the channel and on the fill was difficult, and at times impossible. Plaintiff doubled the number of hauling units he expected to use, and incurred extra costs in the operation and maintenance of his equipment. Additional expense in the maintenance of haul roads was also necessitated. (See further findings 34–36.)

2. As used herein this term includes both wet and saturated materials encountered in the excavation of Channel No. 2, unless otherwise indicated.

The work on the rolled fill was also substantially increased. The wet material had to be dried for periods averaging three-fourths of a day, and layers had to be placed on the fill in shallow lifts of four to six inches in thickness, rather than the nine-inch and twelve-inch lifts prescribed by paragraph 5–03 of the specifications. Plaintiff's planned method for excavating, hauling, and rolling the excavated material was disrupted, and repair costs to equipment were increased.

Both plaintiff and his subcontractor excavated in Channel No. 2. The record shows that 62 per cent of the saturated material was excavated by the subcontractor, and 38 per cent by plaintiff. Plaintiff has no adequate record, however, of how much of the wet material found above the saturated material was excavated by him and how much by the subcontractor.

The amounts claimed because of the wet material are broken down into two items, the cost of excavating and hauling it, and the cost of handling it on the fill. Plaintiff seeks to recover $611,811.21 for excavating, and $93,466.50 for handling the material on the fill. On behalf of his subcontractor plaintiff seeks to recover $536,-227.38 for excavating, and $103,265.24 for handling the material on the fill. Defendant vigorously argues that the excess costs incurred by both plaintiff and his subcontractor as a result of the wet material do not exceed $37,663.71.

We have found on all the evidence before us that the difference between the reasonable cost of the work if wet material had not been encountered and the actual cost due to such wet material was $214,253.88 for that part of the work performed by plaintiff, and $339,677.98 for that part performed by the subcontractor. Included in each of these amounts are the excess costs incurred on the rolled fill because of the wet material, and an allowance of 10 per cent for overhead and profit, broken down as follows:

| | Excavation and hauling | 10 percent overhead and profit | Total | Rolled fill | 10 percent overhead and profit | Total | Total extra cost |
|---|---|---|---|---|---|---|---|
| Shepherd (prime contractor) | $159,126.90 | $15,912.69 | $175,039.59 | $35,649.35 | $3,564.94 | $39,214.29 | $214,253.88 |
| Jones (subcontractor) | 259,628.10 | 25,962.81 | 235,590.91 | 49,170.06 | 4,917.01 | 54,087.07 | 339,677.98 |

The evidence submitted by the parties on the amount of damage sustained by plaintiff and his subcontractor is voluminous. Plaintiff claims considerably more than the amount we have found, and defendant says it should be much less. As in many such cases, it is not possible to compute the amount with mathematical exactness, but after careful consideration of the entire record we have concluded that the above figures come as near being correct as it is possible to arrive at from the proof.

Plaintiff's books and records do not show the excess costs of excavating the wet material and the excess cost of placing it in the fill. They show only the excess costs incurred by plaintiff and by his subcontractor Jones of the excavation of all of Channel No. 2. Nor do plaintiff's books support the amount claimed. His books show that the total excess cost for excavating all of Channel No. 2 was $556,594.62, and Jones' total excess costs for excavating Channel No. 2 amounted to $487,903.51. This includes, by the way, equipment ownership expense, not all of which is allowable.

Something over two million cubic yards were excavated in Channel No. 2, and only 300,000 cubic yards of that amount was wet material; hence, his figures give us no basis from which to determine the excess cost of excavating the wet material alone. The costs reflected by the books include those caused by delays due to weather conditions, by labor shortages, by delays in getting equipment on the project in the

beginning, by the requirement that plaintiff put extra equipment on the job, by a flood, and by other causes. It is not possible to ascertain the amount of excess costs that were attributable to each of these factors, all of which would have increased plaintiff's excess costs even if the wet material had not been encountered. There is no possible way to ascertain from plaintiff's books alone how much of his excess costs were attributable to the encountering of wet material.

However, upon the basis of all the evidence we have determined that the sum of $1.75 per cubic yard was the reasonable cost of excavating, hauling, and dumping the wet and saturated material on the fill areas. From this figure, we have deducted the contract price, less 10 percent for profit, and have multiplied the result by the total yardage which we have found was excavated by plaintiff and by his subcontractor, Jones; 114,000 cubic yards by plaintiff, and 186,000 cubic yards by Jones. The product thus obtained amounts to $159,126.90 for plaintiff, and $259,628.10 for Jones. In addition, we have determined that the additional costs for placing the wet and saturated material on the fill amounted to $35,649.35 for plaintiff, and $49,170.06 for Jones. We then allowed 10 percent for profit and overhead, and arrived at the totals of $214,253.88 for plaintiff, and $339,677.98 for Jones.

Plaintiff is entitled to recover in his own behalf and on behalf of his subcontractor the above excess costs incurred by them due to the wet material, unless, as defendant urges, plaintiff is limited in his recovery by a release executed after the completion of the work.

The facts relative to the release are these: Work on the contract in suit was completed and accepted subject to final cleanup on May 3, 1944. On May 15, 1944, plaintiff submitted to the contracting officer a written document asserting ten claims on behalf of plaintiff and his subcontractor, the A. Raymond Jones Company. This document will hereinafter be referred to as the May claim. It contained four items here pertinent, as follows:

| Item | Amounts |
|---|---|
| 3. Contractor's claim for excavating, hauling, and dumping wet material from Channel No. 2.... | $ 72,081.52 |
| 4. Subcontractor's claim for excavation of wet material from Channel No. 2 | 313,780.99 |
| 5. Contractor's claim for use of pervious material from Channel No. 1 and wet material from Channel No. 2 on fill, and for excessive wetting and rolling of fill.......... | 371,329.60 |
| 6. Subcontractor's claim for use of wet material from Channel No. 2 on fill and for excessive wetting and rolling of fill...... | 113,417.20 |

How much of items 5 and 6 was for the use of the wet material and how much for the use of the pervious material and how much for allegedly excessive wetting and rolling is not shown.

Article 16 of the contract provided that upon completion and after acceptance of all work required under the contract, the amount due the contractor should be paid to him after the contractor furnished to the Government " * * * a release, if required, of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein."

On June 27, 1944, approximately a week after the denial of the May claim by the contracting officer, plaintiff executed a release of "all claims arising under and by virtue of said contract * * * excepting however the claim for additional compensation filed by the contractor under date of May 15, 1944, for the sum of $1,235,833.65, which claim is being appealed."

Plaintiff concedes that the May claim was adopted by reference in the release, and recognizes that this court has held that a contractor is limited in his recovery to the specific items and amounts reserved in the release. Bein v. United States, 101 Ct. Cl. 144; Eastern Contracting Co. v. United

657

States, 97 Ct.Cl. 341; P. J. Carlin Construction Co. v. United States, 92 Ct.Cl. 280. He argues, however, that the release does not limit recovery in this case for several reasons. Plaintiff says that the May claim and the release embodied a serious mistake of fact, *i. e.*, the amount of plaintiff's damage, that this mistake was, by the nature of the transaction, mutual rather than unilateral, and that the release should therefore be reformed to effect substantial justice. Alternatively, plaintiff contends that the release should be reformed even if the mistake was unilateral. Finally, plaintiff urges that, even if effective as written, the release limits recovery only to the total sum excepted from the operation of the release, and not to the several items and amounts specified in the May claim and adopted by reference in the release.

This final proposition must be rejected on the authority of the Bein, Eastern, and Carlin cases, supra.

That this court may, for the purpose of awarding or refusing to award a money judgment against the United States, reform an instrument so as to express the true intent and understanding of the parties to it is well settled. Ackerlind v. United States, 240 U.S. 531, 36 S.Ct. 438, 60 L.Ed. 783; Iowa-Wisconsin Bridge Co. v. United States, 84 F.Supp. 852, 114 Ct.Cl. 464, 504, certiorari denied 339 U.S. 982, 70 S.Ct. 1020, 94 L.Ed. 1386; Sutcliffe Storage & Warehouse Co., Inc. v. United States, Ct.Cl. 112 F.Supp. 590. But we are of the opinion that this is not a proper case for the exercise of that power.

The contract work was completed and accepted subject to final clean-up on May 3, 1944. On May 15, plaintiff filed with the contracting officer a voluminous and very detailed document containing, *inter alia*, the claims here pertinent. This claim was denied by the contracting officer on June 19, 1944. On June 27, 1944, plaintiff executed the release now in question, excepting only the claim filed May 15 in the amount stated. It is obvious that not only were the claims here involved in the minds and contemplation of the parties, but also that all the facts bearing on the existence of the injury were known. Even if it be true that the extent of the injury was not known to plaintiff at that time, we are of the opinion that this is not such a mistake as to justify reformation of the release freely given under the above facts and circumstances.

In his brief plaintiff points to a number of cases involving releases given by a party who has suffered personal injuries as analogous to the facts before us. Even in the personal injury cases, however, a release cannot be avoided merely because the injuries later prove more serious than the releasor believed them to be at the time of executing the release. See Serr v. Biwabik Concrete Aggregate Co., 202 Minn. 165, 278 N.W. 355, 117 A.L.R. 1022; 5 Williston on Contracts (Rev. Ed.) § 1551.

Accordingly, and without discussion of defendant's contentions in opposition to our granting a reformation of the release, we hold that plaintiff is bound by the terms of the release as written, and is limited in his recovery to the specific items and amounts excepted from the operation of the release.

In item 3 of his claim plaintiff reserved his claim for excess costs of excavating, hauling, and dumping wet material from Channel No. 2, in the amount of $72,081.52. Although we have found that plaintiff incurred excess costs on this item in the amount of $175,039.59 (including an allowance of 10 per cent for overhead and profit), he is limited in his recovery to the amount excepted from the release.

Plaintiff reserved a claim in the amount of $371,329.60 for the use of pervious material from Channel No. 1 and wet material from Channel No. 2 on the fill, and for excessive wetting and rolling of the fill. The amount claimed for the use of the wet material alone cannot accurately be determined from the May claim, but we have found that plaintiff incurred excess costs on the rolled fill because of the wet material in the amount of $39,214.29 (including an allowance of ten per cent for overhead and profit). This amount is much less than the total claimed, and, under the circumstances, we think plaintiff is

658

entitled to recover the full amount of $39,-214.29.

In item 4 plaintiff reserved a claim on behalf of his subcontractor in the amount of $313,780.99 for the excavation of wet material from Channel No. 2. We have found that the subcontractor's excess costs on this item were $285,590.91 (including an allowance of 10 per cent for overhead and profit), and plaintiff is accordingly entitled to recover this amount for and on behalf of his subcontractor, the A. Raymond Jones Company.

Plaintiff also reserved a claim in the amount of $113,417.20 on behalf of his subcontractor for the use of wet material from Channel No. 2 and for excessive wetting and rolling of the fill. The amount claimed for the use of the wet material alone cannot accurately be determined from the May claim, but we have found that the subcontractor's excess costs for the use of the wet material on the rolled fill were $54,087.07 (including an allowance of 10 per cent for overhead and profit). This amount is much less than the total amount claimed, and under the circumstances we think plaintiff is entitled to recover this amount for and on behalf of the A. Raymond Jones Company.

Plaintiff is therefore entitled to recover the total sum of $111,295.81 in his own behalf, and the total sum of $339,677.98 for and on behalf of his subcontractor, the A. Raymond, Jones Company.

Judgment for $450,973.79 will be entered.

JONES, Chief Judge, and HOWELL, MADDEN and LITTLETON, Judges, concur.