**COSMO CONSTRUCTION COMPANY and the First National Bank & Trust Company of Tulsa**

*v.*

**The UNITED STATES.**

No. 119–68.

United States Court of Claims.

March 19, 1971.

Joe Francis, Tulsa, Okl., attorney of record, for plaintiffs.

John C. Ranney, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFFS' MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

### PER CURIAM:

This case was referred to Trial Commissioner Louis Spector with directions to prepare and file his opinion on the issues of plaintiffs' motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on July 31, 1970, wherein such facts as are necessary to the opinion are set forth. Defendant has filed a request for review of the opinion by the court and the case has been submitted to the court on oral argument of counsel and the briefs before the commissioner.

Since the court agrees with the opinion and recommended conclusion of the trial commissioner, with minor modifications by the court, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiffs' motion and defendant's cross-motion for summary judgment are both denied and plaintiffs' alternative motion that the case be set down for trial and determination of the issues of fact and law is granted with the case remanded to the trial commissioner accordingly.

Commissioner Spector's opinion, as modified by the court, is as follows:

This is a contract claim in the approximate amount of $125,000,[1] originating out of the construction by plaintiff-contractor for the Department of Interior (Bureau of Reclamation) of Norman Dam on the Little River, near Norman, Oklahoma.

There is a resemblance between this case and that recently decided in Merritt-Chapman & Scott Corp. v. United States,[2] in that the issue presented here also involves the adequacy of the "equitable adjustment" in contract price allowed by defendant following the admitted discovery of "subsurface or latent physical conditions at the site differing materially from those indicated" in the contract.[3]

As in *Merritt-Chapman, supra,* the contracting agency, over plaintiff-contractor's objection, has self-imposed certain limitations on the elements of cost it will consider in computing an equita-

---

[1]. The precise amount is not presently at issue before the court.

[2]. 429 F.2d 431, 192 Ct.Cl. 848 (1970).

[3]. "4. CHANGED CONDITIONS

"The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (a) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (b) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; or unless the Contracting Officer grants a further period of time before the date of final payment under the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 of these General Provisions."

ble adjustment in contract price. Unlike *Merritt-Chapman,* however, this contract does not contain a "Suspension of Work" clause, or one of similar import,[4] with the result that a "jurisdictional" issue has been raised in this case. Following a decision by the contracting officer on the "Changed Conditions" claim, an appeal was taken under the contract "Disputes" article,[5] to the head of the agency, represented by its board of contract appeals. With respect to the specific element of cost involved in this petition, the board stated:

> We have held on many other occasions that the Board lacks jurisdiction to pay for the cost of standby or idled equipment in the absence of a "pay-for-delay" or suspension of work type of contract clause.[14]

> 14. Peter Kiewit Sons' Company, IBCA 405 (November 17, 1965), 72 I.D. 415, 65–2 BCA par. 5157, and authorities cited therein.[6]

4. Authorizing the contracting officer to suspend all or part of the work for the convenience of the Government, and requiring an adjustment of contract price and time of performance under the circumstances described therein.

5. "DISPUTES
"(a) Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final and conclusive unless, within 30 days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the head of the agency involved. The decision of the head of the agency or his duly authorized representative for the determination of such appeals shall be final and conclusive. This provision shall not be pleaded in any suit involving a question of fact arising under this contract as limiting judicial review of any such decision to cases where fraud by such official or his representative or board is alleged: *Provided, however,* that any such decision shall be final and conclusive unless the same is fraud-

Accordingly, the appeal is dismissed as to Claim No. VII.

The Government's counsel had asked the board to take this action.

The background facts are not in dispute.[7] The contract is dated June 28, 1962. It was in the originally estimated amount of $3,692,176.80, and called for construction of an earthen dam, and the relocation of a highway. The dam required excavation of a so-called core trench in the long axis thereof, to a depth of about 45 feet below natural ground surface. The trench was to be backfilled with fine material to form a relatively impermeable core within the dam which would inhibit water seepage. The cutoff trench was designed in the form of an inverted prism, 35 feet wide at the bottom. It was designed to rest there on an assumed rock surface at about elevation 950. It then proceeded upward on a 2 to 1 slope to natural ground surface at approximate elevation 995, where the trench reached a de-

ulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith or is not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of his appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.
"(b) This Disputes clause does not preclude consideration of questions of law in connection with decisions provided for in paragraph (a) above. Nothing in this contract, however, shall be construed as making final the decision of any administrative official, representative, or board on a question of law."

6. See also, United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Nager Elec. Co. v. United States, 396 F.2d 977, 184 Ct.Cl. 390 (1968).

7. As briefly summarized hereinafter, they are taken from the board's decision, and defendant's cross-motion. Plaintiffs' answer thereto states that "[p]laintiffs generally agree with the Defendant's statement of facts, except as hereinafter noted * * *."

signed width of 200 feet. The impermeable core of fine material then was designed to taper and narrow upward from ground surface to the crest of the dam, where its width was about 10 feet.

Performance began in the latter part of 1962 when plaintiff-contractor stripped surface soil to a depth approximating the top of the water table. Then the dewatering subcontractor commenced borings to locate its well point equipment. As the board opinion states, these borings demonstrated on or about March 25, 1963, "that the actual top of sound rock was much lower than the assumed level indicated on the plans." The opinion continues:

> * * * The contractor promptly notified the Government by letter of *March 28, 1962* [sic] concerning the conditions that had been encountered, and requested that the Government make an investigation. The Government soon thereafter analyzed the borings of the de-watering firm and advised the contractor that excavation could proceed in accordance with staking as revised in the field.

> The work of de-watering was begun under a revised subcontract with a negotiated increase in price amounting to $78,000.00 for the first two months and $555.00 per day thereafter. The original subcontract price was $22,680.00 for the first two months and $221.00 per day thereafter. Three stages of well points were used instead of one stage as planned.

> The excavation of the cutoff trench continued with successive restakings until a level of sound rock was reached that was satisfactory to the Government. The depth of the actual sound rock line varied from about 8 feet below the elevation indicated by the plans, near the south end of the cutoff trench, to a maximum of about 25 feet below the original assumed rock level, at the lowest elevation of 927 feet, near the north end of the trench. An earth slide occurred during the latter stages of excavation, and this contributed to the difficulties.

After several conferences and repeated requests by the contractor for a determination with respect to the conditions so encountered, the Government *in August 1963,* issued Part 1 of Change Order No. 3, conceding that changed conditions existed, and providing for the payment to the contractor of the sum of $110,000.00 as a tentative settlement to include additional costs of de-watering for the period ending October 1, 1963. [Emphasis supplied.]

The foregoing developments, of course, ultimately required substantial alteration of the dimensions of the cutoff trench and of the impermeable core from those originally designed, and above described. All work resulting from discovery of the changed conditions was finally completed by December 4, 1963. This is a unit price, estimated quantity type of construction contract featuring a long schedule of pay items, including items for excavation and fill. However, the contracting officer, in acknowledging the discovery of changed conditions and adjusting the contract price, took a narrow view of the costs to be considered. He did not, for example, recognize any increase in the cost of work within the confines of the cutoff trench as it had originally been designed, nor would he consider the effect of the changed conditions beyond the area between stations 21+00 and 36+00. Plaintiff-contractor, on appeal, maintained that the consequences of the changed conditions were not so confined, and claimed that its expenses for all of the work performed at the site between March 25, 1963 and December 4, 1963, under bid items 1, 3, 4, 5, 8, 9, 10, 11 and 13, together with its claim for idled equipment, and correction of a resultant earth slide, should have been adjusted. This was the issue before the board on appeal.

The board took a broader view than had the contracting officer of the equitable adjustment to which plaintiff-con-

tractor was entitled, but it nevertheless imposed residual limitations which have resulted in this lawsuit. In this connection, the board stated:

> At the outset, we must reject the appellant's thesis that all of the increases in costs that have a consequential relation to the changed conditions are properly for inclusion in the adjustment pool. On the other side of the coin, we do not hold with the Government's view that the volume of the originally designed prism of the cutoff trench, *ipso facto,* should be excluded from consideration, nor do we adopt the hypothesis that the clause was intended to provide compensation only for the expense of "correcting the changed condition," as that expression has been used to describe what might be better expressed as "coping with," or "overcoming" the changed condition. * * *

> *       *       *       *       *       *

> The Board concludes that the equitable adjustment intended by the Changed Conditions clause is by no means limited in scope to the narrow confines of the area where the changed condition was found to exist. We shall proceed, therefore, to consideration of the several claims, with a view to determining reasonable limitations of eligibility.

Additional amounts are then allowed or denied for various items of work designated as "claims" I through IX. As *indicated above, this action relates exclusively to "Claim No. VII—Idle Equipment—$115,815.32,"* which is the only "claim" dismissed by the board for want of jurisdiction. In the petition herein, plaintiffs plead it as a breach by defendant "in that it failed to perform the administrative duties required of it under the contract terms in the following particulars, to-wit:

> (a) Defendant failed to make a prompt investigation of the changed condition.

> (b) Defendant failed to furnish Cosmo any timely order, revised drawing, or other document directing the character of work to be performed by Cosmo.

> (c) Defendant required Cosmo to work on a day-by-day basis for a period of six months, revising stake lines on various occasions and thereby causing sliding of earthen embankment.

> (d) Defendant failed to utilize available engineering apparatus to determine the character of work to be expected of Cosmo.

> (e) Defendant failed to use available soil experts and relied upon inadequate borings in directing the day-by-day operations of Cosmo.

> VI. In consequence of the Defendant's actions and breach of the contract as set forth hereinabove, Cosmo's equipment was idled because of general congestion of traffic on the dam site and said equipment could not be moved from the site for the reason that the Defendant could at any time order the full resumption of work at the then acquired elevation, as a result of which Cosmo sustained loss in the amount of $115,815.32 and was required to borrow money, to finance its contract, paying interest thereon, in the amount of approximately $10,000.-00."

As required by Rule 162(a), plaintiffs state that they seek relief "exclusive of the Wunderlich Act, 68 Stat. 81, 41 U.S. C., para. 321–22." From the above quoted portion of the petition, it is apparent that plaintiffs' prayer for relief is primarily founded on alleged inaction and delay on the part of defendant in failing to comply with the "Changed Conditions" article in accordance with its terms relating to procedure. As earlier quoted,[8] the article provides in pertinent part that:

> * * * The Contracting Officer shall *promptly* investigate the conditions, and if he finds that such condi-

8. Note 3 *supra.*

tions do so materially differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of this contract, *an equitable adjustment shall be made and the contract modified in writing accordingly.* [Emphasis supplied.]

Prior to dismissing this claim for want of jurisdiction, the board opinion states with respect to delay that:

In this case for some time after investigation of the alleged changed conditions the contracting officer did not concede that changed conditions had been encountered. It should be noted that the clause requires nothing of the contracting officer beyond an investigation and ruling with respect to the conditions and, if necessary, an equitable adjustment.[7]

7. Morgen & Oswood Construction Co., Inc., IBCA—389 (April 21, 1966), 73 I.D. 131, 66–1 BCA par. 552, citing Shepherd v. United States, 113 F.Supp. 648, 125 Ct.Cl. 724 (1953).

Earlier quotations from the board's opinion refer to the contractor being advised to proceed "in accordance with staking as revised in the field" and to the fact that "excavation of the cutoff trench continued with *successive restakings* until a level of sound rock was reached that was satisfactory to the Government." (Emphasis supplied.) Comparing this with the petition, it is presumably this alleged inaction and piecemeal action upon which plaintiffs' claim of delay and idle equipment is predicated, a claim which the board of contract appeals dismissed for want of jurisdiction "in the absence of a 'pay-for-delay' or suspension of work type of contract clause."

The foregoing notwithstanding, Government counsel urges in this proceeding

9. 384 U.S. 394, 86 S.Ct. 1545.

10. *Id.* at 403, 86 S.Ct. at 1550.

11. Note the similarity to the facts in this case. The concrete aggregate claim is described in *Utah* as follows:
"* * * After completing the contract, the contractor claimed extra compensation based on the poor condition of

that plaintiffs are not entitled to relief "exclusive of the Wunderlich Act" (Rule 162(a), *supra*). Defendant's brief concludes that "[i]n denying a claim within its jurisdiction, the administrative board found that the changed condition caused general congestion of traffic at the site which in turn caused plaintiffs' equipment to be idle. Such a factual finding is final and conclusive absent a showing that it was arbitrary, capricious or not based upon substantial evidence."

This suggested conclusion is clearly in error. It ignores the fact that the agency's board dismissed this claim for want of jurisdiction upon the Government's request. Nager Elec. Co. v. United States, 396 F.2d 977, 184 Ct.Cl. 390 (1968). Insofar as the matter was beyond administrative jurisdiction, the defendant's position also overlooks the principal thrust of the Supreme Court's opinion in Utah.[9] There the Court stated: [10]

We deal first with the issue of the scope of the disputes clause which is raised by the Court of Claims' treatment of the concrete aggregate claim.[11]

The Government reasserts here its position in the Court of Claims [5]

5. Before the Advisory Board of Contract Appeals the Government asserted a contrary position. See n. 7, *infra.*

that the disputes clause authorizes and compels administrative action in connection with all disputes arising between the parties in the course of completing the contract. In its view, the disputes clause is not limited to those disputes arising under other provisions of the contract—Articles 3, 4 and 9 in this case—that contemplate equitable adjustment in price and time

the aggregate, which was alleged to be a changed condition under Article 4. The contracting officer rejected the claim and the Board ruled the appeal was untimely. It remarked, however, that if the claim was one for unliquidated damages for breach of warranty or for delay, it had no jurisdiction to award monetary relief. * * * "

upon the occurrence of the specified contingencies. * * *

We must reject the government position, as did all the judges in the Court of Claims. * * * Our conclusion rests on an examination of uniform, continuous, and long-standing judicial and administrative construction of the disputes clause, both before and after the contract here in question was executed. * * *[12]

Treating with a similar issue thereafter in Len Co. & Associates v. United States,[13] this court stated:

* * * Although arising as a result of the operation of that article, the claims are not made adjustable under or by it. The Supreme Court, this court, and the Armed Services Board have said on many occasions that disputes cannot "arise under" the contract and need not be presented to an administrative tribunal unless some substantive contract provision authorizes the granting of a specific type of relief.[18]

18. United States v. Utah Const. & Mining Co., *supra*, 384 U.S. at 405, 412–418, 86 S.Ct. 1545; * * * 168 Ct. Cl. 522, 537–38 (Davis, J., concurring in part) ("the finality of * * * [Board] findings has been recognized only when the board was considering a contractor's request under some contract provision * * * expressly authorizing the agency to grant an adjustment in price or other specific relief in defined circumstances."); United States v. Anthony Grace & Sons. Inc., *supra*, 384 U.S. [424] at 429, 86 S.Ct. [1539] 1542 [16 L.Ed.2d 662]; J. W. Bateson Co., 61–2 B.C.A. ¶ 3257, at 16,870 (No. 6502) ("the contract does not provide within its four corners for relief"); Simmel-Industrie, 61–1 B.C.A. ¶ 2917, at 15,234 (No. 6141) ("we have repeatedly held that absent a specific provision in the con-

tract authorizing contract price adjustment for the acts complained of, no relief may be granted by this Board."); Murray-Sanders & Associates, 1962 B.C.A. ¶ 3408, at 17,490 (No. 6873) ("Silence in the contract provisions and the absence of negation cannot be considered as substitutes for a positive authorization for such payment."); Moran Towing & Transport Co., 66–2 B.C.A. ¶ 6027, at 27,852 (No. 10681) (dissenting opinion of Mr. Spector) ("The fact that Article 5 is not cast in terms of contract price adjustment is the strongest indication, under the reasoning of *Utah*, that the parties did not intend that liability under Article 5 be a matter for administrative disposition under the Disputes clause, but rather that it was a matter for judicial determination under applicable rules of the law of damages.")

As in *Utah, supra*, the court in *Len* then offered by way of example the very type of claim presented in this case, namely, a claim of damages for delay attributed to the Government, in the absence of a contract adjustment provision such as the "Suspension of Work" clause.[14]

Application of the *Utah* rule is strongly fortified in this case by an additional factor, namely, disavowal by the contracting agency itself at the Government's request of jurisdiction to consider and decide the matter. A board of contract appeals representing the head of the agency, has quite correctly dismissed this claim for want of a "Suspension of Work" article under which to consider it. This was a correct decision for the major part of the claim which could not in any event come under the Changes or Changed Conditions clauses. This is therefore a stronger case for the application of an estoppel (to urge the opposite now) than was presented in Nager Elec. Co. v. United States, 396 F.

12. Also relevant to this case is footnote 15 to the Supreme Court's opinion (384 U.S. at 419, 86 S.Ct. at 1550) which reads:

"Of course, if the findings made by the Board are not relevant to a dispute over which it has jurisdiction, such findings would have no finality whatsoever. See Part II, *supra*; Morrison-Knudsen Co. v. United States, 345 F.2d 833, 170 Ct.Cl.

757; Utah Constr. & Mining Co. v. United States, 339 F.2d 606, 617, 168 Ct.Cl. 522, 539–540 (dissenting opinion of Judge Davis)."

13. 385 F.2d 438, 451, 181 Ct.Cl. 29, 51 (1967).

14. 385 F.2d at 451–452, 181 Ct.Cl. at 51–52.

2d 977, 184 Ct.Cl. 390 (1968). In *Nager,* it appears that the agency had erroneously disclaimed jurisdiction.[15]

Although the board dismisses this claim for want of jurisdiction, its opinion is complicated by an earlier and perfunctory reference to the merits of the claim, in the following words:

> The contractor has misconstrued Paragraph 21e of the General Conditions of the contract for idled equipment, which reads in pertinent part as follows:
>
> > "e. Idle time.—Ownership expense allowance for idle equipment actually employed on the extra work will be made on the basis of 50 percent of the first shift rate for each regular working day, *if the contracting officer determines that the equipment could be used advantageously on other work under the contract and that such use is precluded by impracticability of moving.*" (Emphasis added.)

It does not appear that there was other work under this contract where the idled equipment could have been used. The Board finds that the equipment was idled because of general congestion of traffic on the dam site, and not because it would have been impracticable to move it to a different location on the site if there had been a need for the equipment. Moreover, the contracting officer made no determination in this regard, as required by the clause.

This partial quotation of paragraph 21 of the contract specifications is puzzling, and of questionable relevance. Paragraph 21 is entitled "Equipment Allowance for Contract Adjustments." Subdivision a. "General" begins: "If the contractor is ordered to perform extra work in accordance with Paragraph 7 of the specifications, the allowance made for the equipment used on the extra work shall be determined * * *." The mentioned paragraph 7, "Extras," provides that "[t]he contractor shall, when ordered in writing by the contracting officer, in accordance with Clause 3 of the General Provisions, perform extra work and furnish extra material, not required by the specifications or included in the schedule, but forming an inseparable part of the work contracted for. * * *" Clause 3 of the General Provisions, as referred to therein, is the standard "Changes" clause.

The simple answer to this maze of provisions, all dealing with the pricing of a written order for extra work, is that there has in fact been no written order for extra work relating to this claim. On the contrary, it is a claim for delay-damages allegedly attributable to Government inaction, following notice of changed conditions. Entitlement to these damages has been denied, and dismissed, an action in complete contrast to the ordering of extra work under the "Changes" clause.

Moreover, the above quoted specification provisions did not create new substantive rights. They merely purported to fix in advance the "equitable adjustment" mandated by the standard, mandatory, Government-wide "Changes" clause,[16] and that is not a clause under

---

15. 396 F.2d at 983, 184 Ct.Cl. at 401, " * * * The defendant could waive the contractual requirement that this dispute be handled under the 'disputes' procedure. We simply hold that by its conduct the defendant must be treated as having voluntarily waived this right and therefore is estopped to assert it now. Accordingly, the termination cause of action should be dealt with as a 'breach' claim not arising 'under' the contract." See also National Steel & Shipbuilding Co. v. United States, 419 F.2d 863, 872,

190 Ct.Cl. 247, 261–262 (1969); Jefferson Constr. Co. v. United States, 392 F.2d 1006, 1010–1011, 183 Ct.Cl. 720, 725–727, cert. denied, 393 U.S. 842, 89 S.Ct. 122, 21 L.Ed.2d 113 (1968); and Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963).

16. As explained in Morrison-Knudsen Co. v. United States, 397 F.2d 826, 842–844, 184 Ct.Cl. 661, 686–690 (1968), this practice of promising a remedy in a standard, mandatory Government-wide clause, followed by curtailment of that remedy in

which this claim for damages is "redressable." [17] As correctly concluded by the board, this is the type of claim which would be redressable under a "pay-for-delay" or suspension of work type of contract clause. None being present, the claim was properly dismissed by the board for want of jurisdiction.

Finally, as the board opinion observes, the contracting officer correctly declined to make a determination under specification paragraph 21, and plaintiffs could hardly be required to seek a "remedy" thereunder since none has been made available.[18]

The foregoing considered, the defendant's cross-motion for summary judgment founded upon the board's decision [19] and its record is not well taken, and it must be denied. Although it may eventually appear that some of plaintiffs' idle equipment costs "were the direct and necessary *result of* * * * the changed condition, where that condition * * * directly *leads to* disruption, extra work, or new procedures." [20] the fact is that the contracting officer and the board of contract appeals declined to consider them as an outgrowth of the changed physical conditions encountered, and the board specifically characterized them as subject to analysis as delay-damages under a "Suspension of Work" clause, were such a clause present.

More importantly, the main thrust of plaintiffs' claim appears to be delay and dilatory action on the part of the Government in its failure to investigate "promptly" the conditions to which its attention had been directed, and to modify the contract accordingly, as required by the "Changed Conditions" clause. This is an alleged breach of contract, antedating the ultimate acknowledgment of changed conditions, and, therefore, not redressable under the very clause alleged to have been breached. If there were eventually incurred, costs which could be said to result from the changed conditions (after they were eventually and officially acknowledged), and which were therefore theoretically redressable under that clause, suffice it to say that such costs are so braided with the principal costs claimed for delay in applying the clause that they should in all fairness be tried together.[21]

It follows that plaintiffs' motion for summary judgment, to the extent that it is based on breach of contract (exclusive of the Wunderlich Act), but seeks to rely upon defendant's "administrative records" to eliminate any issues of fact, must also be denied. The facts upon which plaintiffs' claim depends have not yet been tried, as evidenced by administrative dismissal of the claim for want of jurisdiction. Incidental and gratuitous findings not relevant to a dispute over which the board had jurisdiction "would have no finality whatsoever." [22]

---

a locally drafted specification provision, is frowned upon and of questionable validity.

17. Cf. *Utah*, note 6 *supra*. Plaintiffs quite clearly seek damages for breach of contract, and cite typical "breach" cases such as L. L. Hall Constr. Co. v. United States, 379 F.2d 559, 177 Ct.Cl. 870 (1966); and Luria Bros. & Co. v. United States, 369 F.2d 701, 177 Ct.Cl. 676 (1966) in support thereof.

18. Cf. Universal Ecsco Corp. v. United States, 385 F.2d 421, 181 Ct.Cl. 10 (1967); and Universal Ecsco Corp. v. United States, 345 F.2d 586, 170 Ct.Cl. 809 (1965).

19. Interestingly, the board's decision is completely inconsistent with defendant's motion herein. The board dismissed this claim for want of authority to consider it, thereby expressing the opinion that it is the proper subject of a trial de novo in this court.

20. Quoted from *Merritt-Chapman & Scott Corp.*, note 2 *supra*, 429 F.2d at 432, 192 Ct.Cl. at 851 (emphasis supplied).

21. Universal Ecsco Corp., note 18 *supra*, 345 F.2d at 588, 170 Ct.Cl. at 813.

22. Footnote 15 in *Utah*, note 12 *supra*.

Although the parties are privileged (and encouraged) to stipulate the relevant portions of an administrative record in order to narrow the matters to be tried, or in order to place the case in line for summary judgment under Rule 101, that is not the present posture of the case.

However, plaintiffs' alternative motion "that this cause be set for court trial upon any such factual issues requiring evidence in support thereof," is well-founded. On the basis of the foregoing analysis of this troublesome case, plaintiffs are clearly entitled to a judicial trial of the issues of fact and law.

## CONCLUSION

Plaintiffs' motion for summary judgment, and defendant's cross-motion for summary judgment, are both denied. Plaintiffs' alternative motion that the case be set down for trial and determination of the issues of fact and law, is granted.