Whitaker, Judge,
delivered the opinion of the court:
The plaintiff sues the defendant for $61,280.99. The amount of $8,800 thereof is for liquidated damages deducted by the defendant for 88 days’ delay in completing the contract hereafter described. The balance of $52,480.99 is the cost of doing alleged extra work and damages due to the delay said to have been incident to the doing of this alleged extra work.
The main controveráy is over whether or not the plaintiff was required to do work not called for by the contract.
*177 This the plaintiff claims was the building of certain cofferdams to á height above low water greater than it had originally planned to build them.
The contract required the plaintiff, among other things, to strengthen both main piers for the St. Georges Bridge and the north pier of the Summit Bridge. Contract drawing No. 4 set forth the work to be done in strengthening the main piers for the St. Georges Bridge, and contract drawing No. 5 showed the work to be done in strengthening the main pier at the Summit Bridge. As a part of these drawings there was indicated by dotted lines temporary cofferdams inclosing the work to be done. No details, dimensions nor'design were given for these cofferdams, but plaintiff says that since the drawings were drawn to scale, it was possible to ascertain their height above mean low water by scaling them. By doing so, it ascertained the height at the St. Georges piers to be 6 feet 2 inches, and the height at the Summit pier to be 3 feet 3 inches.
When the plaintiff submitted working drawings for these cofferdams, as it was required to do by section 6 (c) of the specifications, it showed a cofferdam for the north pier at the St. Georges Bridge which extended 4 feet above mean low water mark, and one which extended 6 feet 2 inches above mean low water for the south pier at the St. Georges Bridge, and one which extended 5 feet 3 inches above mean low water at the Summit Bridge.
The contracting officer sent these plans to his consulting engineer for comment. The consulting engineer advised the contracting officer that in the last three years there had been six tides a year in the Canal which exceeded 8 feet in height, and one or two a year which had been over 9 feet; therefore, he advised that the cofferdams should be built high enough to protect against a tide of 8]/2 -feet. This increased height he said would require the strengthening of the wales and struts in the cofferdams. Upon receipt of this letter the contracting officer wrote the plaintiff requesting it to revise its drawings by increasing the height of the cofferdams to 10 feet above sea level. In response thereto the plaintiff submitted revised drawings for the three cofferdams increasing the height of all of them to 9% feet above *178 sea level. This increased the height of the cofferdams at both piers of the St. Georges Bridge to 8 feet 10 inches above mean low water, and at the Summit Bridge to 8 feet above mean low water.
The plaintiff says that this request for increased height of the cofferdams was extra work, for which it should be compensated. In support of its position it relies upon two things: (1) the provisions of article 7 of the specifications, which provides: “The mean range of tide in the canal is 5.2 feet at the Delaware River end and 2.3 feet at Chesapeake City”; and (2) the height of the cofferdams as' indicated on the contract drawings.
Plaintiff’s original position seems to have been that the quoted provision of the specifications was a misrepresentation of actual conditions, but this clearly is not true. The testimony sIioavs without controversy that the mean range of-tide was exactly that stated in the specifications. This was not a representation as to the maximum tide to be expected, but only as to the mean range of tide. The use of the words “mean range” carries a necessary implication that sometimes tides ranged above the mean range, because the mean range is the range midway between the low range and the high range, or the average range determined by adding together all the ranges and dividing by the number added together. This, of course, indicates that sometimes the tide ranged above the “mean” or the average range, and sometimes lower. What is meant by “mean range” is clearly explained in the pamphlet of the Uñited States Coast and Geodetic Survey, “Instructions for Tide Observations.” At page 2 this publication says:
The “range of tide” is the difference in height between a high water and a preceding or following low water.
The “mean range” is the average difference in the heights of high and low water at a given place.
The range of the tide at any given place varies from day to day. Variations in the range may at times be caused by varying meteorological conditions, but the principal variations - are brought about by astronomic causes — variations in the relative positions of moon, sun, and earth. At the times of new and full moon the sun and moon are in line relative to the earth, and their *179 tidal forces are then in concert, causing tbe tides to rise bigber and fall lower than usual, so that tbe range at this time is greater than the average. These tides are known as “spring tides” and the range the “spring range.”
This provision of the specifications clearly was not a representation as to the maximum tide that might be expected.
The plaintiff further says that the defendant knew what was tbe maximum height to be expected, and that it was its duty-to furnish plaintiff this information. In the first place, as pointed out above, the representation made in the specifications as to the tides put plaintiff on notice that it-might expect higher tides than the mean high tide. This imposed upon plaintiff the duty to make inquiry as to the height of the tide that might be expected, if it thought this information was necessary.
It is not true, as plaintiff says, that the defendant warranted that its specifications and drawings -would give plaintiff all the information that was necessary for it to have in order to bid.
The cases cited by plaintiff do not so hold. Hollerbach v. United States, 233 U. S. 165, and Christie v. United States, 237 U. S. 234, hold merely that the contractor should be relieved if misled by erroneous statements in the specifications. There were no erroneous statements in these specifications.
In United States v. Spearin, 248 U. S. 132, the contractor had been directed to build a certain sewer at a certain place and according to certain specifications. He built it as specified, but it proved inadequate to carry off the water and the site of the work was flooded. His contract was cancelled because he insisted the defendant should bear the cost of remedying the defect. The court held he was entitled to recover damages therefor. This was plainly correct because the damage resulted from an inadequate structure built according to specifications prepared by the defendant.
Steel Products Eng. Co. v. United States, 71 C. Cls. 457, goes no further than the Spearin case.
Moreover, the contract did not require plaintiff to use cofferdams in the construction of the work, and, since infor *180 mation as to the height of tides to be expected was necessary only if cofferdams were to be used, there was no obligation on defendant to give-'plaintiff this information until it knew plaintiff was to use cofferdams. Section 42 of the specifications provide:
The contract drawings show temporary sheet pile cofferdams inside of which it is contemplated that the work of strengthening the main piers will be carried on however, the contractor may elect to use such other methods of construction as will - furnish a completed structure in strict accordance with the plans and specifications. * * *
Until the defendant knew that the plaintiff intended to use cofferdams, certainly there was no duty upon it to give plaintiff information necessary only in the event cofferdams were to be used. When the defendant learned that plaintiff did expect to use cofferdams, it promptly gave it the information as to the height of the tides to be expected.
In order to demonstrate that the increased height of the cofferdams was extra work, plaintiff relies mainly upon the above quoted provision of the specifications. To a lesser extent it relies upon the contract drawings which indicated cofferdams' within which the- contract work was to be constructed. As stated, no dimensions were given for these cofferdams, but when the drawings were scaled they showed a height above mean low water for the piers of the St. Georges Bridge of approximately 6 feet 2 inches, and 3 feet 3 inches for the pier of the Summit Bridge. It is, however, clear, we think, that this was not a requirement as to the height the cofferdams were to be constructed above low water mark. In the fir'st place, the contractor was not required to build any cofferdams at all and, therefore, of course the drawings cannot be construed to have required it to build any particular type or height of cofferdam.’
Moreover, the testimony is quite clear that the indication of cofferdams was nothing more than an- indication of how the contract work might be constructed, and was not a requirement of how it should be constructed.. Being merely an indication of what the contractor might want to do, no *181 attempt was made to specify definitely the dimensions of the cofferdams, nor of their design, nor of the materials to be used in constructing- them.
The obligation of preparing the drawings for the temporary work to enable the contractor to perform the work required by the contract was on the contractor. Since' this was the obligation of the contractor and since the defendant when it prepared the contract drawings did not know whether or not the contractor would use cofferdams, of course no effort was made to specify dimensions, height, materials, or the design of them. The contract drawings merely indicated that the work-might be constructed within cofferdams; but the kind of cofferdams that, would be required the defendant did not undertake to state. It took no action with respect to this until the contractor submitted its plans for the cofferdams it proposed to use.
When these plans were submitted by plaintiff, the contracting officer “requested” certain amendments therein so as to prevent the flooding of the cofferdams. The testimony shows that frequently cofferdams are not built high enough to take care of all high water, because frequently it is uneconomical to do so, the parties preferring to let the cofferdams be flooded occasionally rather than go to the extra expense. The contracting officer in this case, however, thought that if these cofferdams were built to the height proposed by' plaintiff they would be so frequently flooded that the plaintiff would not be able to properly do the work required within the time allowed. Therefore, he “requested” the contractor to change its plans. We cannot say that this was a demand.on the part of the contracting officer; it was.not framed as a demand, but as a request; but whether or not a demand, it was acceded to by the plaintj.fi without protest and without claim being made that extra work was being required of it.
Evidently the plaintiff thought that the demand, if such it was, was one which the contracting officer was authorized by the contract to make. Plaintiff never made any claim that more was being required of it than was authorized by the contract until over four months after the entire contract *182 had been completed. This was over 18 months alter the particular work was-.clone.: \Plainly, plaintiff did not think that, more was being required ‘of it than the contract authorized.
Plaintiff’s failure to make any protest is all the more indicative in view of the provisions of article 5 of the contract, providing that “* * * no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order,” and in view of the provisions of article 30 of the specifications, which provides:
If the contractor considers 'any work required of him to be outside the requirements of the contract * * * he shall ask for written instructions or decision immediately, and then file a Ayritten, protest with the' contracting officer against the same within ten days thereafter, or be considered as having accepted the record or ruling.
.Since the contractor did not make any protest against building the cofferdams higher, it must be “considered as having accepted the record or lulling.”
The plaintiff is not entitled to recover on this item.
The plaintiff also sues to recover liquidated damages deducted in the amount of $8,800 for 88 days’ delay. In its' petition it says:
* * * Any and all delays in the plaintiff’s performance for which the plaintiff w^s penalized were due entirely to the aforesaid changes in the specifications and plans which said changes were made by the War Department, United States Engineer Office, subsequent to the execution of said contract. * * *
As we have said above, the responsibility for drawing plans for the necessary cofferdams was a responsibility on the plaintiff and, 'therefore, the delay in perfecting plans for proper cofferdams was plaintiff’s fault, unless defendant unduly delayed approving them. The proof shows that the contracting officer was prompt in acting upon plaintiff’s proposed plans. He requested these plans on December 30, 1935, the date he gave notice to proceed. They were furnished on January 10, 1936. A week later the consulting *183 engineer, after reviewing them, forwarded his changes to the contracting officer. Within three days thereafter the contracting officer wrote the plaintiff requesting changes along the lines of those proposed by the consulting engineer. Nine days later these revised drawings were submitted by the plaintiff. These were forwarded by the contracting officer to the consulting engineers on February 13, 1938. They were returned by the consulting engineers with their approval on February 15,1936, and were forwarded to plaintiff by the contracting officer with his approval on February 18, 1936, It appears from this that the contracting-officer acted promptly, except, perhaps, in forwarding plaintiff’s revised plans to the consulting engineer. He received these plans on January 29, 1936, and forwarded them on February 13, 1936; but this delay, if unreasonable, is immaterial, because the work was suspended from January 23, 1936 to March 9, 1936 on account of bad weather. Any unnecessary delay, therefore, between January 29, 1936 and February 13, 1936 had no effect upon the completion of the contract. Time' for its completion was extended by the contracting officer on account of the delay due to bad weather from January 23, 1936 to March 9, 1936.
. Since it was not the fault of the contracting officer that the drawings for the cofferdams were not correct in the first place, and since the contractor was delayed by bad weather during the entire time- correct drawings were in course of preparation, it cannot be said, that the delay incident to approval of the plans was the fault of the defendant.
Nor was plaintiff delayed because more was required of it than the contract called for, as we have heretofore pointed out.
Whatever may have been the cause of the delay, whether or not it was due to the incompetency of the plaintiff or to its lack of organization of the work, as defendant alleges, it has. not been shown that the delay was due to the'act of the defendant, as plaintiff alleges, nor, for that matter, to any other cause for which plaintiff should be. excused.
*184 It results, therefore, that plaintiff is not entitled to recover the liquidated damages deducted.
Plaintiff’s petition must be dismissed. It is so ordered.
MaddeN, Judge; JoNes, Judge; and Whaley, Chief Justice, concur.
LittletoN, Judge, dissents.