The LEN COMPANY AND ASSOCIATES

v.

The UNITED STATES.

No. 257–63.

United States Court of Claims.

Oct. 13, 1967.

Marvin P. Sadur, Washington, D. C., for plaintiff. Herman M. Braude, Washington, D. C., of counsel.

David Orlikoff, Washington, D. C., with whom was Acting Asst. Atty. Gen. Carl Eardley, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON DEFENDANT'S REQUEST FOR REVIEW OF THE COMMISSIONER'S ORDER DENYING DEFENDANT'S MOTION TO SUSPEND PROCEEDINGS

DAVIS, Judge:

This is another Government contract case in which the key question is whether the trial of the contractor's claims

shall be held administratively or in court. Cf. New York Shipbuilding Corp. v. United States, 385 F.2d 427, 180 Ct.Cl. —— (June 1967); Universal Ecsco Corp. v. United States, Ct.Cl. 385 F.2d 421, decided this day. In August 1958 the Len Company entered into a Capehart Act housing contract with the Navy for 650 housing units at Pearl Harbor. As was customary for such projects, the work was divided into separate mortgage areas, the contract was made severable as to each area, and mortgagor-builders were appointed.[1] During the progress of construction on the seven units, periodic inspections were made and certificates of acceptable work and materials issued. When the work was well advanced, the Navy's contracting officer was replaced. The new official called for various reinspections and then found that several elements of the job did not conform, in his view, with the plans and specifications. The result was that plaintiff had to alter considerable portions of completed work.

Fifteen of the seventeen counts in the petition relate to the work done pursuant to these reinspection orders. Counts I–XIII and XVI (the reinspection claims) broadly urge that this work was not required by the contract but was extra. Count XVII, the most significant financially (amounting to almost one-half of the total relief requested), is a conventional "delay-damages" claim for detriment occurring because of this allegedly extra work. The remaining claims, Counts XIV and XV, are not directed to the reinspection but involve disputes as to the correct equitable adjustment on account of two separate formal changes in the contractual requirements.

The parties acknowledge that Counts XIV and XV are redressable under the "Changes and Changed Conditions" clause (Article 9 of the general provisions) and, taken alone, would ordinarily be subjected to the administrative procedure established by that provision. It is also agreed that Count XVII for delay damages is a breach-of-contract demand which, to the extent its facts differ from previously-litigated claims arising under the contract, should be tried in this court.[2] See United States v. Utah Constr. & Mining Co., 384 U.S. 394, 418–422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Morrison-Knudsen Co. v. United States, 345 F.2d 833, 837–838, 170 Ct.Cl. 757, 764 (1965); J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 241, 171 Ct.Cl. 70, 77 (1965). The real controversy is over the disposition of the reinspection claims (Counts I–XIII and XVI), and whether the hair (Counts XIV, XV, and XVII) should follow the hide.

Each of the reinspection claims concerns work accomplished, but assertedly not paid for, during construction in the seven mortgage areas. As each of these units was completed, the contractor sought releases with permission to except its claims for additional work. The contracting officer (the Navy District Public Works Officer) refused to allow exceptions as to any one unit until all seven were finished. In August 1960, upon completion of the housing in the last mortgage area, plaintiff presented its claims for extra compensation. The contracting officer held that these claims

---

1. The provisions of law which are collectively referred to as the Capehart Act are set out in 12 U.S.C. §§ 1748–1748i and 42 U.S.C. §§ 1594–1594k (1964). For detailed descriptions of the construction and financial procedures required for these projects, see Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, 457–458, cert. denied 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963); G. L. Christian & Associates v. United States, 312 F.2d 418, 424 n. 9, 160 Ct.Cl. 1, 13 n. 9, cert. denied 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963); Anthony P. Miller, Inc. v. United States, 348 F.2d 475, 172 Ct.Cl. 60 (1965).

2. Plaintiff originally included a request for delay damages with its other claims submitted to the Federal Housing Commissioner. Apparently recognizing that this delay claim was not remediable under the contract, the company did not list it in the complaint filed with the Armed Services Board of Contract Appeals.

could be processed only under the change-request procedure detailed in General Provision No. 9 of the contract, "Changes and Changed Conditions". The claims were thus submitted, processed, and denied by the Public Works Officer in November 1960.

Shortly thereafter, the contracting officer initiated eleven "change requests" for deductive change orders—work which varied from the contract terms and which, in the Government's view, called for a price reduction. Plaintiff submitted its countering estimates and argument. In December the contracting officer determined that the Government was entitled to a credit. Under the "Changes" clause procedure, the contracting officer forwarded both sets of requests with his "recommendations" (denying all of the company's requests and granting partial relief on the deductive requests he had initiated) to the Federal Housing Administration. That Administration's District Director acknowledged that his review of the change requests was limited by "outstanding instructions"—agreed to by his agency and the Defense Department—"whereby FHA accepts the amounts recommended and certified by the contracting officer." [3] Accordingly, he accepted the contracting officer's recommendation with respect to each claim, thereby denying all but three of the change-requests. Of the three confirmed changes, two resulted in decreases in the contract price (i. e., credits to the Government) and the other in an increase, but not as substantial as sought by plaintiff. After the FHA's action, the last mortgage area was closed and the contractor received the remaining portion of the proceeds from the seven mortgages.

Prior to the FHA decision, the contractor, which had learned of the District Public Works Officer's unfavorable recommendation, filed an appeal with the Secretary of the Navy. The case was referred to the Armed Services Board of Contract Appeals, where the Government moved to dismiss for lack of juris-diction. The motion was granted and the appeal dismissed in September 1962. Len Co. & Associates, 1962 B.C.A. ¶ 3498 (No. 7151). The Board concluded that it could not hear the merits of the dispute because the contractor had already received a decision from the FHA in accordance with the contract's terms.

In September 1963 plaintiff filed its petition in this court. The defendant, in March 1966, moved to suspend proceedings to allow the parties to return to the ASBCA or the FHA for complete administrative determination of disputed factual questions on the reinspection claims. The trial commissioner first denied the motion, without prejudice, on the authority of Anthony Grace & Sons, Inc. v. United States, 345 F.2d 808, 170 Ct.Cl. 688 (1965). After the Supreme Court's reversal of that decision (384 U.S. 424, 83 S.Ct. 1539, 16 L.Ed.2d 662 (1966)), the denial was rescinded and the motion restored to the docket. The parties sought to agree upon removal of the case to the Armed Services Board without a formal order. Attempts to amend the "Disputes" clause or to enter into a stipulation failed. The trial commissioner then denied the Government's motion, holding that in the circumstances a *de novo* trial in this court would be proper. The case is before us on the defendant's request to review that ruling.

I

The constitution governing the mode of resolving the parties' disputes is always the particular contract made by the contractor and the Government. Both the Supreme Court and this court have confirmed that it is within the parties' power to select their own remedies (subject to the overriding requirements of the Wunderlich Act). United States v. Carlo Bianchi & Co., 373 U.S. 709, 713, 715–718, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 428–429, 83 S.Ct. 1539, 16 L.Ed.2d 662 (1966); United States v. Utah Constr. & Mining Co., supra 384 U.S. at 402–407, 415–418,

---

3. See Part II, infra.

86 S.Ct. 1545, 16 L.Ed.2d 642; New York Shipbuilding Co. v. United States, supra, 385 F.2d 427, 180 Ct.Cl. —— (June 1967). That choice can, of course, point to administrative determination. If so, and "the contract makes provision for equitable adjustment of particular claims, such claims may be regarded as converted from breach of contract claims to claims for relief under the contract." United States v. Utah Constr. & Mining Co., supra, 384 U.S. at 404 n. 6, 86 S.Ct. at 1551; see Morrison-Knudsen Co. v. United States, supra, 345 F.2d at 837, 170 Ct.Cl. at 763–764. To the extent that complete relief is available under a specific provision—i. e., the claim is both cognizable under and adjustable by the terms of the contract— such as the currently standard "Changes", "Changed Conditions", or "Inspection" clauses, the controversy arises under the contract and is subject to initial administrative resolution as provided in the normal "Disputes" article. But if a fair reading of the particular contract shows that the specific dispute has not been committed to agency decision, the claims are then for a "pure" breach of contract and are considered *de novo* in this court.[4]

Accepting this settled formulation, the Government contends that plaintiff's requests for compensation for the modifications which the successor contracting officer required as a result of his reinspections are demands for equitable adjustments for "constructive changes" which are cognizable under, and adjustable by, either Article 9, "Changes and Changed Conditions", or Article 6, "Inspection". As constructive changes, according to this theory, the claims should be decided in the first instance by the contracting officer, with an appeal either to the Federal Housing Commissioner (designated in the "Changes" article) or to the Armed Services Board of Contract Appeals (referred to in the "Disputes" clause).

The flaw in this argument is that it overlooks the special provisions of the plaintiff's Capehart Act contract and divorces the "constructive change" doctrine from the type of contractual "Changes" clause to which it has always been wedded. This court has never indicated that the doctrine inheres in or is applicable to every "Changes" clause, regardless of its terms or coverage. From the beginning, regard has been had for the individual provision. For some years judges interpreted such articles with strict literalism, refusing to grant relief for extra work unless both the contractor and the Government had scrupulously followed the specific requirements of the clause.[5] One result was to accord relief only for consensual modifications in plans, specifications, or design.

During the past three decades we have been much less rigid. But the important point is that, most often, these later cases have interpreted the standard "Changes" clause in government construction or supply contracts, a clause which enables the contracting officer "at any time, by a written order, and without notice to the sureties, [to] make changes in the drawings and/or specifications of this contract and within the

---

4. Or in the district courts, which, in suits involving less than $10,000, share concurrent jurisdiction with this court. 28 U.S.C. § 1346(a) (2) (1964).

5. See, e. g., Plumley v. United States, 226 U.S. 545, 547, 33 S.Ct. 139, 57 L.Ed. 342 (1913); Kilmer v. United States, 48 Ct. Cl. 180, 193–194 (1913); Daly & Hannan Dredging Co. v. United States, 55 Ct.Cl. 1, 6 (1919); Bates & Rogers Constr. Co. v. United States, 56 Ct.Cl. 49, 57–58 (1921); Sanford & Brooks Co. v. United States, 58 Ct.Cl. 158, 161–162 (1923), aff'd 267 U.S. 455, 45 S.Ct. 341, 69 L. Ed. 734 (1925); Morgan v. United States, 59 Ct.Cl. 650, 654 (1924); Lovell v. United States, 61 Ct.Cl. 756, 761– 762 (1926); Griffiths v. United States, 74 Ct.Cl. 245, 256–257 (1932); Pope v. United States, 76 Ct.Cl. 64, 96–99 (1932); Globe Indemnity Co. v. United States, 102 Ct.Cl. 21, 35 (1944), cert. denied 324 U.S. 852, 65 S.Ct. 712, 89 L.Ed. 1412 (1945).

general scope thereof." [6] Where such a clause (or a comparable one) is included, we, as well as the Armed Services Board of Contract Appeals, have held that, if a contracting officer compels the contractor to perform work not required under the terms of the contract, his order to perform, albeit oral, constitutes an authorized but unilateral change in the work called for by the contract and entitles the contractor to an equitable adjustment in accordance with the "Changes" provision.[7] The court has considered it to "be idle for the contractor to demand a written order from the contracting officer for an extra when the contracting officer was insisting that the work required was not additional * * *" and, therefore, has often dispensed, on these occasions, with the formality of issuing a written change order under the standard clause. Fleisher Eng'r & Constr. Co. v. United States, 98 Ct.Cl. 139, 158 (1942); Fox Valley Eng'r, Inc. v. United States, 151 Ct.Cl. 228, 238 (1960). But each of the other elements of the standard "Changes" or "Extras" clause has been present—the contracting officer has the contractual authority unilaterally to alter the contractor's duties under the agreement; the contractor's performance require-

ments are enlarged; and the additional work is not volunteered but results from a direction of the Government's officer. See Spector, "An Analysis of the Standard 'Changes' Clause", 25 Fed.B.J. 177, 179 (1965).

■■ That judicial and administrative tribunals no longer find it necessary to dwell upon this rationale when the constructive-change doctrine is invoked under a standard "Changes" clause indicates the theory's widespread acceptance *in such cases* [8] but does not point to its applicability in every instance in which a contracting officer requires the contractor to perform work not called for by the contract, regardless of the nature and terms of the "Changes" clause inserted by the contracting parties into their agreement. In all cases, the contracting officer, as part of his duty to assure compliance by the contractor with the plans and specifications, has the power to order the work done in a manner which is reasonable and proper. See 32 C.F.R. § 1.201-3 (1966). This does not, however, enable him, by himself, to alter those plans and specifications, either by direct order or constructively. That type of authority must be conferred by some substantive provision of the contract. If the officer erroneously interprets the

6. This excerpt is from the General Provisions for Construction Contracts, Standard Form 23A, March 1953 ed., printed in 41 C.F.R. § 1–16.901–23A (1961). The corresponding language of the April 1961 and June 1964 editions of the standard "Changes" provisions for construction contracts is virtually identical. See 41 C.F.R. § 1–16.901–23A (1962) (1965). Predecessor "Changes" and "Extras" clauses, to which the constructive change doctrine has been applied, have involved the same basic elements as the quoted passage. For example, a general clause used in construction contracts in the 1930's and 1940's stated in part: "Extras—Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order." See Davis v. United States, 82 Ct.Cl. 334, 344–347 (1936); Wisconsin Bridge & Iron Co. v. United States, 97 Ct.Cl. 165, 182 (1942).

7. See, e. g., Suburban Contracting Co. v. United States, 76 Ct.Cl. 533, 545 (1932); Griffiths v. United States, 77 Ct.Cl. 542, 557 (1933); Davis v. United States, 82 Ct.Cl. 334, 344–347 (1936); Fleisher Eng'r & Constr. Co. v. United States, 98 Ct.Cl. 139, 158 (1942); W. H. Armstrong & Co. v. United States, 98 Ct.Cl. 519, 530–531 (1943); Virginia Eng'r Co. v. United States, 101 Ct.Cl. 516, 533 (1944); Fox Valley Eng'r Inc. v. United States, 151 Ct.Cl. 228, 238 (1960); Polan Indus., Inc., 58–2 B.C.A. ¶ 1982, at 8189 (Nos. 3996–97, 4104–07, 5054–55); J. W. Hurst & Son Awnings, Inc., 59–1 B.C.A. ¶ 2095, at 8964 (No. 4167) and cases cited.

8. See, e. g., Jack Stone Co. v. United States, 344 F.2d 370, 170 Ct.Cl. 281 (1965); Morrison-Knudsen Co. v. United States, supra, 345 F.2d at 837 n. 2, 170 Ct.Cl. at 763 n. 2, and cases cited; Gholson, Byars & Holmes Constr. Co. v. United States, 351 F.2d 987, 994–995, 173 Ct.Cl. 374, 388 (1965).

specifications, and appropriate protest is made, a claim arising under the agreement's "Changes" clause may, but not necessarily, be created. Categorization of the claim—"arising under" the contract, or breach of contract—depends upon the particular clause, its words and intent. If the dispute flowing from the officer's conduct is cognizable under and adjustable by that "Changes" provision, it arises under the contract and becomes subject to the contract's administrative procedure. On the other hand, if the conflict is not redressable under the clause, the officer's erroneous interpretation is a breach of contract, which is triable in court. Once it is ascertained, the court must abide by the disposition of the controversy agreed to by the parties and placed in their agreement. But it goes without saying that we cannot rewrite, by an undiscriminating use of the constructive-change doctrine, the parties' own contract. Cf. United States v. Utah Const. & Mining Co., supra, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642; United States v. Anthony Grace & Sons, Inc., supra, 384 U.S. 424, 83 S.Ct. 1539, 16 L.Ed.2d 662.

In this case, we are compelled to conclude that the Government, when it drafted the general provisions for Capehart Act housing projects (including Article 9, "Changes and Changed Conditions"), and when it made its bargain with the Len Company in 1958, failed to make this type of constructive-change claim cognizable under and adjustable by the terms of Article 9.[9] In the 1950's when the Government wrote this article, it had already formulated a variety of standard clauses providing for specific relief under the contract in a broad range of circumstances. See G. L. Christian & Associates v. United States, 320 F.2d 345, 353, 160 Ct.Cl. 58, 71, cert. denied 375 U.S. 954, 84 Ct.Cl. 444, 11 L.Ed.2d 314 (1963). It had long operated under standard "Changes" and "Extras" clauses in regular construction projects. It was cognizant of rulings and decisions spanning three decades, by both administrative boards and this court, interpreting the standard clauses and charting the development of the so-called constructive-change doctrine. Nevertheless, exercising its statutory power to initiate and draft special provisions applicable to

9. The three sections of Article 9 which deal with "Changes" read as follows:

"(a) The Contracting Officer may, at any time, by a Construction Change Request, Form FHA 2437, and without notice to sureties, propose changes in the Drawings and/or Specifications of this Housing Contract and within the general scope thereof. Each such proposed construction change will be submitted to the eligible builder for his estimate of the increase or decrease in cost and time of performance, if any. After such action by the eligible builder, the proposed construction change will be returned to the Contracting Officer. Likewise, the eligible builder may, without notice to sureties, propose changes within the same scope, all such proposed changes to be in writing and to contain the eligible builder's estimate of the increase or decrease in cost and time of performance, if any, and to be submitted to the Contracting Officer. In all cases, the eligible builder will sign proposed construction changes for himself and as agent for the respective mortgagor-builders.

"(b) All proposed construction changes, including those resulting in no increase or decrease of cost will be submitted by the Contracting Officer to the Commissioner, with copy to the affected mortgagees. The determination of the Commissioner as to the increase or decrease in cost and time of performance shall be final with respect to all such changes to be paid or deducted from mortgage proceeds. If any such change is approved by the affected mortgagee and the Commissioner to be paid or deducted from mortgage proceeds, the amount of the maximum insurable mortgage and this Housing Contract will be considered as modified by such approved construction changes, and the eligible builder shall proceed diligently to execute such approved construction change.

"(c) No change of any character shall be made unless in pursuance of a written order approved as required in the preceding paragraphs, and no claim for adjustment of the contract sum shall be recognized unless the eligible builder, prior to the making of such claim for adjustment, is in receipt of an approved written order."

Capehart Act projects, the defendant apparently found it desirable to embark on a new course.

Unlike the normal "Changes" provision, Article 9 does not purport to deal with unilateral changes and does not contain a mechanism for the resolution of such a conflict. Its words do not confer the power on any one person (contracting officer, contractor, or Federal Housing Commissioner) to make unilateral changes in the contract's drawings or specifications, but rather contemplate a consensual process in which the contracting officer, the eligible builder (contractor), and the Federal Housing Commissioner all participate.[10] The contracting officer's authority is expressly limited to *proposing* construction changes; the contractor also may propose and must estimate the increase or decrease in cost and time of performance, if any, of each change. The Government's "Construction Change Request" Form, implementing Article 9, requires the signatures of all the concerned parties to accompany proposed changes as an expression of the parties "intention to execute the changes described herein." [11] All "proposed construction changes", including those resulting in no increase or decrease in cost, are then submitted to the Housing Commissioner whose "determination * * * as to the increase or decrease in cost and time of performance shall be final with respect to all such changes to be paid or deducted from mortgage proceeds." The contractor is directed to execute such construction changes only after the Commissioner's (and affected mortgagee's) approval of the requests. "No change of any character shall be made unless in pursuance of a written order approved as required in the preceding paragraphs. * * * "

The application of this procedure is satisfactory so long as both the contractor and the contracting officer agree that a change is being made. Where there is no such consensus, the mechanism is wholly inadequate. The Federal Housing Commissioner apparently lacks

10. The Armed Services Board of Contract Appeals appears to have recognized that doctrines which have been developed for and associated with the standard "Changes" clause are not necessarily applicable to this unique Capehart Act housing provision. For example, the Board has rejected the argument that the "cardinal change" rule is applicable to Article 9 even though the clause provides that proposed changes must be "within the general scope" of the contract—words which, when used in the standard "Changes" clause, form the basis for declaring an act to be a cardinal change. See Saddler v. United States, 287 F.2d 411, 413–415, 152 Ct.Cl. 557, 561–564 (1961). The Board's position rested on the view that under the Capehart Act "Changes" clause:

"Each change had to be priced and agreed to by the appellants [contractor] in advance of undertaking the changed work. The changes were not change orders in the sense of change orders under a Government Standard Form contract. The changes under the subject Capehart contract were, in effect, supplemental agreements executed by both parties. This being so, the scope of the original contract was extended by mutual consent of the parties in each instance of change." [Murray-Sanders & Associates, 1962 B.C.A. ¶ 3408, at 17,492 (No. 6873).]

This interpretation of Article 9 supports our conclusion that disputed unilateral changes are not cognizable under the terms of this particular "Changes" clause.

11. The Construction Change Request Form used in conjunction with Article 9 in Capehart Act projects reads in part:

"IMPORTANT.—The Eligible Bidder, Mortgagor, Contracting Officer, and Mortgagee indicate by signing this form that it is the expressed intention to execute the changes described herein: It is understood and agreed by all parties hereto that no changes will be acceptable unless required (1) to meet changed conditions encountered during construction, (11) to correct deficiencies in the Drawings and Specifications discovered during construction or (111) to effectuate certain provisions of the Housing Contract designed for the protection of the Military, and it is further understood and agreed that the determination of the Commissioner as to the increase or decrease in cost and time of performance shall be final with respect to all changes to be paid or deducted from mortgage proceeds." Anthony P. Miller, Inc., 61–1 B.C.A. ¶ 2929, at 15297 (No. 6178).

contractual authority to reject completely a recommended change [12]—whether the initiating party is the contractor or the contracting officer. His role, true to his concern that construction costs not exceed mortgage proceeds or statutory cost limitations, is confined to reviewing change requests and deciding questions related to cost and time of performance. It is also significant that, when the Article 9 procedure was established (and when these parties concluded their agreement), the Federal Housing Commissioner had no facilities, procedures, or experience to ferret out and analyze information on the issue of whether a work assignment was required by the contract plans and specifications. Rather than providing for authoritative resolution of the basic question of whether a change has been or must be initiated—as does the standard "Changes" clause—Article 9 seems to begin with the premise that the contracting parties agree to the necessity for change, but differ only as to the secondary problem of the effects (cost and time of performance) of that change.

The special "Disputes" clause tailored for these earlier Capehart Act agreements also differs, relevantly, from the ordinary version.[13] The contracting officer is given authority to decide factual disputes only if these have not been finally decided by the Housing Commissioner; this, in itself, tends to indicate that *changes* which are outside of Article 9 are not covered by any administrative mechanism. Moreover, the administrators had no power "to make any decision which shall cause the total amount payable to the eligible builder [contractor] under this Housing Contract to exceed the maximum amount payable from mortgage proceeds." It is difficult, if not impossible, to reconcile this express restraint with a grant of normal authority in the contracting officer (as under the standard "Changes" article) to make unilateral or constructive changes which, very often, would exceed the statutory limits. See Anthony P. Miller, Inc. v. United States, 348 F.2d 475, 172 Ct.Cl. 60 (1965).

■ For these reasons—the marked and deliberate departures of this contract's "Changes" and "Disputes" articles from the standard varieties; the Government's awareness of the place and theory of the constructive-change doctrine and that doctrine's close connection with the wording of the standard article; the central position but limited powers of the Federal Housing Commissioner

---

12. Aside from a change which would cause the statutory limits to be exceeded.

13. This contract's "Disputes" clause was as follows:

"Except as otherwise provided in this Housing Contract, any dispute concerning a question of a fact arising under this Housing Contract which is not finally decided by the Commissioner, which may be adjusted between the eligible builder and the Contracting Officer and which is not in fact disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the eligible builder. Within 30 days from the date of receipt of such copy, the eligible builder may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the head of the Department, and the decision of the head of the Department or his duly authorized representative for the hearing of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent or capricious or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence, be final and conclusive; provided that, if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive; and provided further, that in no event shall the Contracting Officer, the head of the Department or his duly authorized representative have authority under this clause to make any decision which shall cause the total amount payable to the eligible builder under this Housing Contract to exceed the maximum amount payable from mortgage proceeds. In connection with any appeal proceeding under this clause, the eligible builder shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the eligible builder shall proceed diligently with the performance of this Housing Contract and in accordance with the decision of the Contracting Officer."

under Article 9; and the FHA's lack of resources and capability to decide whether a unilateral change had been made— we could not read the "Changes" clause of plaintiff's contract as covering administrative relief for unilateral disputed changes unless there were very strong extra-contractual grounds for doing so.

We do not find any such reason. There is no indication, for one thing, that when these parties signed their contract in 1958, less than three years after the general provisions for Capehart Act housing contracts were prepared, the Government or the contractor believed, or was led to believe, that disputed unilateral changes were cognizable under the "Changes and Changed Conditions" provision (Article 9) and subject to administrative determination. The defendant has not contended that judicial or administrative construction of the provision supports such a view. In fact, the Armed Services Board of Contract Appeals and this court did not consider Capehart Act appeals, much less the nuances of this "Changes" clause, until after the Len Company's contract was made. There is also little to suggest that this issue was raised before the Federal Housing Commissioner. In any case, the Commissioner's decisions, pursuant to Article 9's procedures, normally took the form of letters forwarded to the participating contracting officer and eligible builder; it is unlikely that other Government officials would have relied on them, absent an ASBCA or court ruling, if they had known of them at all.

In the judicial and administrative decisions rendered *after* 1958, we see no "uniform, continuous, and long-standing judicial and administrative construction", United States v. Utah Constr. & Mining Co., supra, 384 U.S. at 405, 86 S.Ct. 1545, at 1551, of this Capehart Act "Changes" clause supporting the Government's present interpretation. The Supreme Court in *Utah* examined three decades of precedent established by the Court of Claims and various Boards of Contract Appeals in which these tribunals uniformly construed a contract provision. The Court found that, "long prior" to the execution of the *Utah* contract, it was "the settled practice" of the Court of Claims and the various Boards to interpret that clause in a certain way. Rulings on this issue were "in fact legion". Id. at 406, 86 S.Ct. 1545.

In contrast, any assistance we might derive from judicial and administrative interpretation can result from only nine years of experience, all of which was acquired after the Len Company contract was made. Equally important, during this period the issue of whether unilateral changes are remediable under the "Changes" clause was never raised, briefed, argued, or decided by this court (or any other). On occasion, after consideration of the parties' substantive contentions, we have suspended our proceedings in a Capehart Act case so that the ASBCA could consider the remaining issues. See Anthony P. Miller, Inc. v. United States, supra, 348 F.2d 475, 172 Ct.Cl. 60. But the tacit and uncontested disposition of that case is not a proper precedent for similar action here. *Anthony Miller* held that a Capehart Act contractor could be compensated from appropriated funds for certain claims even though such payments would cause the cost of the housing to exceed the authorized mortgage insurance under the statute. Our concern in 1965 was directed toward the funds which could be used to pay claims. Neither party raised, nor did the court consider, the entirely separate question of whether under the particular contract the Federal Housing Commissioner, the Armed Services Board of Contract Appeals, or this court should initially determine disputed claims payable from such funds. The case was (in effect) remanded to the ASBCA without any suggestion that the administrative agency was without power, under that Capehart Act agreement, to pass upon unilateral (including constructive) change orders. Cf. Tufano Contracting Co. v. United States, 365 F.2d 535, 174 Ct.Cl. 398 (1966) (court trial of issue of unilateral change).

Neither do the decisions of the Armed Services Board (all rendered after 1958

but before the Supreme Court's *Utah* decision) establish or even point toward one uniform and continuous line of precedent. Where the Board has discussed the meaning and scope of the Capehart Act "Changes" clause, its interpretation has generally accorded with our present conclusion. In its earliest decision, it stated, "The 'Changes' article speaks of a 'proposed' change which contemplates a specific planned change in the contract and not constructive changes such as are involved here." C. H. Leavell & Co., 59–1 B.C.A. ¶2062, at 8714–15 (Nos. 4762–63). The Board dismissed the case on other grounds, indicating, however, that relief was available in the Court of Claims. And, as suggested in footnote 10, supra, in Murray-Sanders & Associates, 1962 B.C.A. ¶3408, at 17490 (No. 6873), the Board observed:

> From * * * [a reading of the "Changes and Changed Conditions" article] it is clear that the parties provided for changes during the performance of the contract. It is also clear that both parties could recommend changes. When both parties agreed to a particular change, the mortgage loan could be increased or decreased with the consent of FHA who was insuring the loan.

The ASBCA has expressly rejected the position that a contracting officer's order can be viewed as a constructive change, appealable to the Board. "As we view it, the only plausible theory upon which appellant can seek relief under the contract is to treat the order of the contracting officer as a constructive change. Unfortunately, that avenue of relief is foreclosed by the language of the Changes Article which states: 'No change *of any character* shall be made unless in pursuance of a written order approved as required * * * in the contract article.' " "What we can't overlook is the fact that under the contract the power of decision is in the Commissioner." Tufano Contracting Co., 59–1 B.C.A. ¶2245, at 9924 (No. 5487). The Board, however, did let stand the Federal Housing Commissioner's determination of the disputed change—perhaps intimating that the Commissioner, rather than the ASBCA, might hear constructive-change disputes under the "Changes" article.

It is true that in the great majority of cases recorded during the past nine years the parties have either assumed or agreed that their dispute could be resolved administratively. They have not chosen to raise plaintiff's present arguments or actively to contest the meaning and scope of the Capehart Act contract's "Changes" clause. Whatever the reason for this reticence, its result has been that the Armed Services Board of Contract Appeals has not expressly and directly dealt with our issue of whether disputed unilateral changes are cognizable under Article 9. At times, courts say that unquestioned acceptance, without discussion, of a rule over a long span of years should not be upset when the point is finally raised. This is not such a case. In the decisions in which the Board has either examined or acquiesced in the Housing Commissioner's review of the merits of a claim for equitable adjustment for disputed unilateral changes, we find no semblance of the development of a uniform procedure for treating such unilateral changes. Indeed, the singular characteristic of the practice under this "Changes" article has been uncertainty and variety; there has been no real consensus.[14]

14. These diverse practices developed for dealing with disputed changes in Capehart Housing projects: (i) Contracting officer refuses to decide the dispute and refers it to the Federal Housing Commissioner for determination. See, e. g., Philip Yousem, 65–1 B.C.A. ¶ 4564, at 21,845 (No. 7303) ; J. W. Bateson Co., 1962 B.C.A. ¶ 3326, at 17,136 (No. 7766) ; Richards Constr. Co., 1962 B.C.A. ¶ 3614, at 18,198–99 (No. 7317) ; (ii) Contracting officer decides the dispute and contractor appeals this decision to the ASBCA without obtaining the Commissioner's determination. See, e. g., Anthony P. Miller, Inc., 61–1 B.C.A. ¶ 2918, at 15,237, 15,244 (No. 5983) ; Fort Sill Associates, 1962 B.C.A. ¶ 3418, at 17,512 (Nos. 7482 & 7925) ; Murray-Sanders & Associates, 61–2 B.C.A. ¶ 3221, at 16,-

On the other hand, our conclusion that disputed unilateral changes, such as plaintiff's reinspection claims, are not remediable under Article 9, as it appears in the present contract, is supported by two aspects of the history since 1958 of changes under Capehart Act agreements. The first is that the Government apparently thought it necessary, in individual instances, to alter the general provisions for Capehart Act contracts to insure that relief for such changes would be available under the contract. In F. P. Lathrop Constr. Co., 1964 B.C.A. ¶4253, at 20,592–93 (No. 8858), the ASBCA found that the parties had extensively altered the standard Capehart Act contract provisions to expand the contracting officer's powers and provide for relief for disputed changes. The Board said:

> The fact that a change qua change must be approved by the Federal Housing Commissioner does not detract from nor modify the clear provisions of the contract clause specifying the procedure to be followed and treatment to be accorded a disputed question. That an entirely different treatment was intended to be accorded the settlement or resolution of disputed matters from that applicable to the affirmative making of an undisputed change in the contract is made clear by the last proviso of subparagraph (a) of the Disputes provision itself. It is there stated that disputed questions may be settled by the contracting officer and the contractor by supplemental agreement without reference to either the Changes article or approval by the Federal Housing Commissioner.

The other circumstance relates to the subordinate role, by the agencies' agreement, of the FHA in passing upon change requests. In November 1958, the Defense Department and FHA agreed that, "Any construction change request submitted by the Military will be accepted by FHA without its performing any independent analysis as to acceptability or cost", if the cost had been established by the military, is accurate by accepted standards of practice, and complies with statutory limitations prescribed by the National Housing Act. ASHMI Letter No. 27, dated Nov. 21, 1958, reproduced in Len Co. & Associates, 1962 B.C.A. ¶3498, at 17,857 (No. 7151). See also Richards Constr. Co., 1962 B.C.A. ¶3614, at 18,199–200 (No. 7317). If we were to adopt the Government's current argument that Article 9 encompasses the making of disputed unilateral changes, we would be saying that the contracting officer's decision regarding the nature of the change would in effect be binding, pursuant to this inter-agency agreement, on the Federal Housing Commissioner. Unlike the standard "Changes" and "Disputes" procedures, under which the contractor is assured of a hearing on a disputed change by an impartial administrative tribunal, the Capehart Act contractor would gain little from his administrative remedies. We cannot say that adoption of the inter-agency agreement was intended to secure such an illusory remedy for government contractors. We think, rather, that the Defense Department and the FHA understood, when they adopted the policy (in 1958), that the Capehart Act "Changes" clause was concerned only with formal bilateral changes agreed to by the parties, and that the special procedures of Article 9 applied solely to such cases. Straining to read the clause to include disputed unilateral changes, as the Government now

696 (No. 6934) ; F. D. Rich Co., 1962 B.C.A. ¶ 3628, at 18,254 (No. 6703) ; Green Manor Constr. Co., 1964 B.C.A. ¶ 4168, at 20,285 (No. 5310) ; (iii) Contracting officer decides the dispute and, at the contractor's request, refers the dispute to the Commissioner for determination. See, e. g., C. H. Leavell & Co., 59–1 B.C.A. ¶ 2062, at 8711 (Nos. 4762–63) ; Len Co. & Associates, 1962 B.C.A. ¶ 3498, at 17,855 (No. 7151) ; (iv) Contracting officer decides the dispute and requests the Commissioner to also decide the question while the contractor appeals the officer's decision to the ASBCA. See Tufano Contracting Co., 59–1 B.C.A. ¶ 2245, at 9920–21( No. 5487) ; J. J. Fritch, Gen. Contractor, Inc., 60–1 B.C.A. ¶ 2644, at 13,095 (No. 5777). See also Tufano Contracting Co. v. United States, 356 F. 2d 535, 174 Ct.Cl. 398 (1966) (court trial).

recommends, would raise a serious question of the propriety of the inter-agency agreement.[15] See United States v. Anthony Grace & Sons, Inc., supra, 384 U.S. at 428–432, 86 S.Ct. 1539, 16 L.Ed.2d 642. Nor do we think that a contractor would have agreed to such a one-sided procedure for administrative resolution of a contractual dispute over the contents of plans or specifications. Cf. Deloro Smelting & Ref. Co., Ltd. v. United States, 317 F.2d 382, 387, 161 Ct.Cl. 489, 496–497 (1963).

The defendant's remaining contention under the "Changes" article is that, even if it does not provide administrative relief for disputed changes to be financed from mortgage proceeds, the ASBCA should hear and determine these reinspection claims since plaintiff has already received the entire mortgage proceeds and any further compensation must come from appropriated funds, under our decision in Anthony P. Miller, Inc. v. United States, supra, 348 F.2d 475, 172 Ct.Cl. 60. This argument misconceives the *Anthony Miller* ruling. As we have already indicated, its effect is limited to defining the fund from which otherwise redressable claims may be paid. It does not offer any guidance as to whether particular claims are cognizable under the terms of particular contract provisions. Nor does it sanction a court's substituting an administrative forum for the judicial remedy contemplated by the parties.

The Government also urges that a Navy Memorandum of September 23, 1961, enabled the Contract Appeals Board to hear and determine the reinspection claims.[16] Whether or not an agency can, by itself, require administrative relief for breach-of-contract claims, or convert breach claims into claims "arising under" the contract subject to the disputes process, we do not believe that this memorandum had such a purpose. The directive does not broaden the type of claim cognizable under the Capehart Act "Changes" article. It is designed for only those changes which, under the contract provision, the parties have already committed to the Federal Housing Commissioner's determination. The memorandum's purpose is limited to obtaining additional relief from the Armed Services Board for such Article 9 claims. See Anthony Grace & Sons, Inc., 61–2 B.C.A. ¶3195, at 16,561, 16,563 (No. 6921). Claims outside the scope of that clause (and not redressable under other contract provisions) remain breach-of-contract claims —not to be decided by any administrative tribunal, but initially triable in court.

## II

The defendant also urges that the reinspection claims arise and are remediable under Article 6, the "Inspection" clause, of the parties' contract.[17] The

---

15. We need not now decide whether the ASHMI Letter No. 27 so nullifies the contractual remedy for bilateral changes made under the "Changes and Changed Conditions" article as to make it inadequate or unavailable under *Anthony Grace & Sons, Inc.*, supra. It is not at all clear that the Government considers this procedure, adopted ten years ago and before the recent trilogy of Supreme Court decisions, to be still applicable.

16. Paragraph 6(a)–(b) of the September 23rd Memorandum stated:

"(a) Where a dispute has not been finally decided on its merits by the Federal Housing Commissioner or his representative, the failure of the Commissioner to act should not preclude the Board from determining the appeal on its merits, within the limitations hereinbefore set forth.

"(b) Where the Federal Housing Commissioner or his representative has rendered a final decision on the merits of a dispute, the Board may determine the effect to be given the decision, without reference to this memorandum."

The memorandum is set forth in full in Appendix A to the ASBCA's decision in Anthony Grace & Sons, Inc., 61–2 B.C.A. ¶ 3195, at 16,562–64 (No. 6921).

17. The portion of Article 6 relied upon by the Government states:

"(a) Except as otherwise provided herein, all material and workmanship, if not otherwise designated by the Specifications, shall be subject to inspection, examination, and test by the Contracting Officer at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or

argument runs that the gravamen of claims I–XIII and XVI is that government inspectors found the Len Company's work unsatisfactory and required corrective measures. Since the inspections and correction orders were made pursuant to Article 6, the Government says that any relief must take the form of an equitable adjustment in the contract price and be initially determined by the Armed Services Board of Contract Appeals.

■ Accepting arguendo the Government's characterization of the reinspection claims, we do not find them redressable under the "Inspection" article because that provision does not authorize the granting of specific relief if, in fact, the additional work proves not to be required. Although arising as a result of the operation of that article, the claims are not made adjustable under or by it. The Supreme Court, this court, and the Armed Services Board have said on many occasions that disputes cannot "arise under" the contract and need not be presented to an administrative tribunal unless some substantive contract provision authorizes the granting of a specific type of relief.[18]

The most frequent application of this rule has been the refusal to allow a price adjustment for additional costs incurred as a result of government-caused delay where such relief is not made available by the terms of the "Changes" article used in construction contracts. See, e. g., J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 171 Ct.Cl. 70 (1965); Norair Eng'r Corp., 57–1 B.C.A. ¶1283 (No. 3527); Simmel-Industrie, 61–1 B.C.A. ¶2917 (No. 6141). The parties may convert a breach claim into one "arising under" the contract by fashioning additional contract adjustment provisions like the "Suspension of Work" clause. See United States v. Utah Constr. & Mining Co., supra, 384 U.S. at 415–418, 86 S.Ct. 1545, 16 L.Ed.2d 642. The remedy is then available as a result of a clear directive agreed to by the parties and is not imposed upon them by a court's forced interpretation of their actual agreement.

The terms of this Capehart Act "Inspection" article demonstrate that its

construction are carried on. The Department and a mortgagor-builder, or either of them, shall have the right to reject defective material and workmanship or require its correction. Rejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material, without charge therefor, and the eligible builder shall promptly segregate and remove the rejected material from the premises. If the eligible builder fails to proceed at once with the replacement of rejected material and/or the correction of defective workmanship, such failure may be treated as a default."

18. United States v. Utah Const. & Mining Co., supra, 384 U.S. at 405, 412–418, 86 S.Ct. 1545, 16 L.Ed.2d 642, Utah Const. & Mining Co. v. United States, 339 F.2d 606, 616, 168 Ct.Cl. 522, 537–538 (Davis, J., concurring in part) ("the finality of * * * [Board] findings has been recognized only when the board was considering a contractor's request under some contract provision * * * expressly authorizing the agency to grant an adjustment in price or other specific relief in defined circumstances."); United States v. An-

thony Grace & Sons, Inc., supra, 384 U.S. at 429, 86 S.Ct. at 1542; J. W. Bateson Co., 61–2 B.C.A. ¶ 3257, at 16,870 (No. 6502) ("the contract does not provide within its four corners for relief"); Simmel-Industrie, 61–1 B.C.A. ¶ 2917, at 15,-234 (No. 6141) ("we have repeatedly held that absent a specific provision in the contract authorizing contract price adjustment for the acts complained of, no relief may be granted by this Board."); Murray-Sanders & Associates, 1962 B.C.A. ¶ 3408, at 17,490 (No. 6873) ("Silence in the contract provisions and the absence of negation can not be considered as substitutes for a positive authorization for such payment."); Moran Towing & Transport. Co., 66–2 B.C.A. ¶ 6027, at 27,852 (No. 10681) (dissenting opinion of Mr. Spector) ("The fact that Article 5 is not cast in terms of contract price adjustment is the strongest indication, under the reasoning of *Utah*, that the parties did not intend that liability under Article 5 be a matter for administrative disposition under the Disputes clause, but rather that it was a matter for judicial determination under applicable rules of the law of damages.")

function is to authorize an inspection procedure which insures satisfactory and timely compliance by the contractor. There is no indication that the parties sought to provide an administrative remedy for violation by the Government of its requirements, compelling additional work. In contrast to the silence of this special provision, the standard "Inspection" clause for construction contracts, in use when the Capehart Act provision was drafted and incorporated in plaintiff's contract, clearly and explicitly provided for an adjustment in contract price as well as an extension of time if required.[19] With this exemplar before it, the Government's failure to provide for any such relief in Article 6 is the strongest indication that plaintiff's reinspection claims are not redressable under this provision of the contract and therefore not subject to the administrative "Disputes" procedure.

### III

We conclude that the Len Company's reinspection claims are not remediable or adjustable under either the "Changes and Changed Conditions" or the "Inspection" clause of its Capehart Act housing contract. Relief is not available under the contract. The claims are therefore free from administrative disposition. Conversely, Counts I–XIII and XVI are "pure" breach-of-contract claims to be heard *de novo* in this court. As noted at the outset, Count XVII, the claim for "delay" damages, is also properly before the court. Accordingly, the Government's motion to suspend proceedings with respect to these fifteen claims was properly denied by the trial commissioner.

On the other hand, Counts XIV and XV of the petition are redressable under the "Changes and Changed Conditions" clause and would normally be subject to initial administrative determination by the FHA. The trial commissioner held, however, that "a suspension of proceedings in this court to permit the parties to return to the FHA for an administrative determination of the facts would be an exercise in futility" because the FHA has not had, and does not now have, procedures or facilities for administrative appeals. We have interpreted Article 9 as empowering the Housing Commissioner to hear only those matters, such as Counts XIV and XV, as to which both parties concur that a change is being made. See Part I supra. In this light, we cannot now declare that a proper administrative remedy under Article 9 is not available or adequate. Spurred by the Supreme Court and this court, the FHA may promptly establish and pursue correct procedures, and if it does so plaintiff will have no cause for

19. The pertinent portion of the standard "Inspection" clause used in construction contracts from 1953–1961 states:

"9(c) Should it be considered necessary or advisable by the Government at any time before final acceptance of the entire work to make an examination of work already completed by removing or tearing out same, the Contractor shall on request promptly furnish all necessary facilities, labor, and material. If such work is found to be defective or nonconforming in any material respect, due to fault of the Contractor or his subcontractors, he shall defray all the expenses of such examination and of satisfactory reconstruction. *If, however, such work is found to meet the requirements of the contract, the actual direct cost of labor and material necessarily involved in the examination and replacement, plus 15 percent, shall be allowed the Contractor and he shall, in addition, if completion of the* *work has been delayed thereby, be granted a suitable extension of time on account of the additional work involved.*" [Emphasis added.] 41 C.F.R. § 1–16.901–23A (1961).

In April 1961 the relief authorized by the standard clause was slightly altered. The amended version reads:

"10(e) * * * If, however, such work is found to meet the requirements of the contract, an equitable adjustment shall be made in the contract price to compensate the Contractor for the additional services involved in such examination and reconstruction and, if completion of the work has been delayed thereby, he shall, in addition, be granted a suitable extension of time." 41 C.F.R. § 1–16.401(g), § 1–16.901–23A (1964).

The June 1964 version is identical to the April 1961 clause. See 41 C.F.R. § 1–16.901–23A (1965).

complaint on these two counts. Cf. United States v. Anthony Grace & Sons, Inc., supra, 384 U.S. at 428–432, 83 S.Ct. 1539. There is no showing that the failure up to now to give proper administrative consideration to these claims is more the Government's fault than the contractor's, or that the default is inexcusable. See also footnote 15 supra. Accordingly, we suspend our consideration of these two minor claims to allow them to be processed under the terms of Article 9.

This disposition of the petition's seventeen claims is not contrary to the decision in Universal Ecsco Corp. v. United States, 170 Ct.Cl. 809 (1965) (per curiam). In that case, we asserted jurisdiction over relatively unimportant claims (less than $13,500 out of a total demand of over $500,000), which were probably adjustable under a "Changes" article, because the contractor had "braided them together" in its petition with the dominant breach-of-contract claims and we felt that all of the interrelated matters should be tried at one time. Id., 345 F.2d at 588, 170 Ct.Cl. at 813–814. In the current case, Len Company has affirmatively acknowledged that Counts XIV and XV, amounting to less than 3% of the total relief requested, are in no manner related to the breach-of-contract claims, and there is no reason for them to be heard with the other fifteen counts. Moreover, this portion of *Universal Ecsco* should, at best, be kept within its own narrow limits and not extended. The Supreme Court's subsequent opinion in United States v. Anthony Grace & Sons, Inc., supra, 384 U.S. 424, 83 S.Ct. 1539, 16 L.Ed.2d 662, tells us that, where the parties have contractually bargained for an administrative remedy, such procedures, if available, must not be circumvented by this court's retaining the dispute for *de novo* trial.

The defendant's request to reverse the trial commissioner's order is denied as to Counts I–XIII, XVI, and XVII, on the grounds we have set forth, and the commissioner's denial of the motion to suspend is affirmed as to those counts. On those counts the case is remanded to the trial commissioner and will proceed in due course. With respect to Counts XIV and XV, the defendant's motion and request are granted and the proceedings will be suspended for a period of 90 days to allow the parties to obtain the appropriate administrative determination or otherwise dispose of the matter.